No. 23–1302

———————————————

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————————————

**THOMPSON CORRUGATED SYSTEMS, INC., and THOMPSON CORRUGATED SYSTEMS, LLC,**

Plaintiffs–Appellees,

v.

**ENGICO S.R.L.,**

Defendant–Appellant.

———————————————

On Appeal from the United States District Court
for the Southern District of Illinois
Case No. 3:20–cv–00122–JPG
Hon. J. Phil Gilbert, Judge Presiding

———————————————

## BRIEF AND REQUIRED SHORT APPENDIX
## OF APPELLANT ENGICO S.R.L

———————————————

Charles R. Bernardini
Kevin P. Shea
Seth A. Horvath
Margaret E. Borse
**Nixon Peabody LLP**
70 W. Madison St., Suite 5200
Chicago, Illinois 60602
Telephone: (312) 977-4400
Facsimile: (312) 977-4405
cbernardini@nixonpeabody.com
kpshea@nixonpeabody.com
sahorvath@nixonpeabody.com
mborse@nixonpeabody.com

*Attorneys for Apellant Engico S.r.l.*

**ORAL ARGUMENT REQUESTED**

## <u>DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellant Engico S.r.l. ("Engico") states that Nixon Peabody LLP represents it in this appeal, and Latimer LeVay Fyock LLC and Tressler LLP represented it before the district court. Zetacarton S.p.A. ("Zetacarton") owns a 60% interest in Engico. No publicly held company owns any percentage of Engico. This information has not changed since Engico's counsel filed their Appearances and Circuit Rule 26.1 Disclosure Statements on February 22, 2023. (COA Doc. #4, 6, 7, 8, Appearances & Disclosure Statements.)

## **TABLE OF CONTENTS**

DISCLOSURE STATEMENT .................................................................. *Supra*

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES.................................................................. iv

JURISDICTIONAL STATEMENT ......................................................... 1

I.    The District Court's Jurisdiction ........................................... 1

II.   This Court's Jurisdiction ...................................................... 3

STATEMENT OF THE ISSUES ........................................................... 4

STATEMENT OF THE CASE ............................................................... 4

I.    The Parties ............................................................................ 4

II.   Nature of the Case ................................................................ 5

III.  Statement of Relevant Facts................................................. 8

      A.    The Complaint........................................................ 8

      B.    The Answer ............................................................ 8

      C.    Summary Judgment.............................................. 10

            1.    The Factual Record ...................................... 10

            2.    Engico's Motion for Summary Judgment ........................... 13

            3.    TCS's Motion for Summary Judgment .............................. 15

            4.    The Summary-Judgment Order........................................ 16

      D.    The Trial ............................................................... 18

            1.    Testimony Regarding the Alleged 2004 Agreement............. 18

            2.    Testimony Regarding the Alleged 2018 Agreement............. 20

      E.    The Jury Instructions and Verdict ............................................. 21

F.    The Final Judgment ................................................... 22

SUMMARY OF ARGUMENT ........................................................ 22

STANDARD OF REVIEW ........................................................... 25

ARGUMENT ........................................................................... 26

I.    The district court erred in concluding that there was no genuine issue of material fact regarding the existence and enforceability of the alleged 2004 oral sales-representative agreement between TCS and Engico ..... 26

A.    Under Illinois law, no contract exists if the terms of an alleged agreement are not sufficiently definite and certain to reflect a meeting of the parties' minds .................................................. 27

B.    The existence of a sales-representative agreement between Engico and TCS was a question of fact for the jury to decide ................. 29

1.    The district court mischaracterized Engico's position regarding oral agreements ................................................ 30

2.    The district court resolved multiple factual disputes in TCS's favor .................................................. 32

3.    The cases on which the district court relied do not support its summary-judgment ruling ............................................ 38

4.    The district court's summary-judgment ruling fundamentally altered the parties' trial .............................. 40

II.    The district court erred in concluding that there was no genuine issue of material fact regarding the enforceability of the alleged 2018 oral agreement to continue Engico's relationship with TCS until 2021 ........ 41

A.    Engico did not waive its statute-of-frauds defense ...................... 41

B.    The district court erred in concluding that the statute of frauds did not apply to the parties' alleged 2018 agreement .................. 46

1.    At a minimum, Engico established a genuine issue of material fact regarding whether the alleged 2018 agreement was performable within a year .......................... 48

2.    The complete-performance exception to the statute of frauds does not apply ........................................ 51

3.    The partial-performance exception to the statute of frauds does not apply........................................................ 52

CONCLUSION .............................................................................................. 53

CERTIFICATE OF COMPLIANCE ......................................................... Appended

CIRCUIT RULE 30(d) STATEMENT ..................................................... Appended

CERTIFICATE OF SERVICE ............................................................... Appended

REQUIRED SHORT APPENDIX.............................................................A 1–A 49

# TABLE OF AUTHORITIES

**Federal Cases**

*Abrams v. Ill. Coll. of Podiatric Med.*,
  77 Ill. App. 3d 471 (1st Dist. 1979) .................................................... 28, 30

*Acad. Chi. Publishers v. Cheever*,
  144 Ill. 2d 24 (1991) ................................................................27, 28, 31, 39

*Anderson v. Fel–Pro Chem. Prods., L.P.*,
  No. 95 C 4604, 1996 WL 33410082
  (N.D. Ill. Dec. 19, 1996) ...........................................................32, 35, 37, 40

*Anderson v. Kohler*,
  397 Ill. App. 3d 773 (2d Dist. 2009) .................................................... 52, 53

*Arbogast v. Chi. Cubs Baseball Club, LLC*,
  2021 IL App (1st) 210526 .................................................................... 27, 29

*Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*,
  493 F.3d 841 (7th Cir. 2007) ..................................................................... 31

*Bensdorf & Johnson, Inc. v. Telecom Ltd.*,
  58 F. Supp. 2d 874 (N.D. Ill. 1999) ........................................................... 53

*Berg v. N.Y. Life Ins. Co.*,
  831 F.3d 426 (7th Cir. 2016) ............................................................... 25, 26

*Berkowitz v. Urso*,
  2014 IL App (1st) 121662 .......................................................................... 52

*Brown v. Goodman*, 147 Ill. App. 3d 935
  (1st Dist. 1986) ........................................................................................ 35

*Cain v. Cross*,
  293 Ill. App. 3d 255 (5th Dist. 1997)......................................................... 53

*Canteen Corp. v. Former Foods, Inc.*,
  238 Ill. App. 3d 167 (1st Dist. 1992) ......................................................... 34

*Carlton at the Lake, Inc. v. Barber*,
  401 Ill. App. 3d 528 (1st Dist. 2010) ......................................................... 28

*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*,
  811 F.2d 326 (7th Cir. 1987) .......................................................42, 43, 44

*Dickens v. Quincy Coll. Corp.*,
   245 Ill. App. 3d 1055 (4th Dist. 1993)......................................... 53

*Dresser Indus., Inc. v. Pyrrhus AG*,
   936 F.2d 921 (7th Cir. 1991) ..................................................42, 43, 44, 45

*Extrusion Dies Indus., LLC v. Bielloni Castello S.P.A.*,
   No. 3:07–CV–583–BBC, 2007 WL 5613511
   (W.D. Wis. Dec. 10, 2007)........................................................... 2

*Flannery v. Recording Indus. Ass'n of Am.*,
   354 F.3d 632 (7th Cir. 2004) ...................................................... 29

*Floyd Lofchie & Assocs., Inc. v. Alsy Mfg. Co.*,
   No. 88 C 10780, 1989 WL 152669 (N.D. Ill. 1989)...................... 37

*Hammond Group. Ltd., v. Spalding & Evenflo Cos.*,
   69 F.3d 845 (7th Cir. 1995) ................................................... 49, 50

*Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653
   (7th Cir. 2004).............................................................................. 38

*Head v. Chi. Sch. Reform Bd. of Trs.*,
   225 F.3d 794 (7th Cir. 2000) ...................................................... 26

*Hubble v. O'Connor*,
   291 Ill. App. 3d 974 (1st Dist. 1997) ......................................... 43

*Indus. Representatives, Inc. v. CP Clare Corp.*,
   74 F.3d 128 (7th Cir. 1996) ........................................................ 50

*Ivey v. Transunion Rental Screening Sols., Inc.*,
   2022 IL 127903............................................................................. 27

*Janky v. Lake Cnty. Visitors & Convention Bureau*,
   576 F.3d 356 (7th Cir. 2009) ...................................................... 26

*Jespersen v. Minn. Mining & Mfg. Co.*,
   183 Ill. 2d 290 (1988) ................................................................. 50

*Ken–Pin, Inc. v. Vantage Bowling Corp.*,
   No. 02–cv–7991, 2004 WL 783092 (N.D. Ill. Jan. 20, 2004)...... 31

*Kiosk Promotions, Inc. v. Tex. Wiz, LLC*,
   No. 1:19–CV–01847, 2021 WL 4498907 (N.D. Ill. Mar. 30, 2021) ............. 50

*Kluge v. Brownsberg Cmty. Sch. Corp.*,
__ F.4th __, 2023 WL 2821871 (7th Cir. Apr. 7, 2023) ................................ 25

*Lessman v. Universal Spray Applications, Inc.*,
690 F. Supp. 679 (N.D. Ill. 1988) ................................................................ 51

*Mapes v. Kalva Corp.*,
68 Ill. App. 3d 362 (2d Dist. 1979) ............................................................. 43

*McInerney v. Charter Golf, Inc.*,
176 Ill. 2d 482 (1997) ............................................................................ 48, 51

*Midland Distrib., Inc. v. Zest US Wholesale, Inc.*,
No. 21 C 1403, 2021 WL 4745265 (N.D. Ill. Oct. 12, 2021) ....................... 34

*Midland Hotel Corp v. Reuben H. Donnelly Corp.*,
118 Ill. 2d 306 (1987) ............................................................................ 27, 39

*Morey v. Hoffman*,
12 Ill. 2d 125 (1957) ................................................................................... 39

*Ne. Ill. Reg'l Commuter Ry. Corp. v. Kiewit W. Co.*,
396 F. Supp. 2d 913 (N.D. Ill. 2005) ........................................................... 30

*Pa. Gear Corp. v. ACSA Steel Forgings, S.P.A.*,
No. CIV.A. 02–4359, 2002 WL 32113734
(E.D. Pa. Nov. 20, 2002) ............................................................................... 2

*Pepper Constr. Co. v. Palmolive Towers Condos., LLC*,
2016 IL App (1st) 142754 ............................................................................ 29

*Perez v. Abbott Labs.*,
No. 94 C 4127, 1995 WL 86716 (N.D. Ill. Feb. 27, 1995) ..................... 30, 31

*PGA USA, LLC v. Popi Trading, Inc.*,
No. 16–6669, 2016 WL 4261726 (E.D. La. Aug. 12, 2016) .......................... 2

*R.J.N. Corp. v. Connelly Food Prods., Inc.*,
175 Ill. App. 3d 655 (1st Dist. 1988) ........................................................... 50

*Robinson v. BDO Seidman, LLP*,
367 Ill. App. 3d 366 (1st Dist. 2006) ...................................................... 48, 49

*Russian Media Grp., LLC v. Cable Am., Inc.*,
598 F.3d 302 (7th Cir. 2010) .................................................................. 45, 46

*Sangston v. Ridge Country Club,*
No. 93 C 0628, 1993 WL 356927 (N.D. Ill. Sept. 13, 1993) ........................ 51

*Sherwin v. Ault,*
219 Ill. App. 3d 213 (3d Dist. 1991) .................................................... 49, 50

*Sloger v. Midwest Med. Supply Co.,*
No. 04–CV–291–WDS, 2006 WL 288137 (S.D. Ill. Feb. 6, 2006) ........... 31, 32

*Thorn v. Sundstrand Aerospace Corp.,*
207 F.3d 383 (7th Cir. 2000) .................................................................. 26

*Tobey v. Extel/JWP, Inc.,*
985 F.2d 330 (7th Cir. 1993) ................................................................. 26

*Toll Processing Servs., LLC v. Kastalon, Inc.,*
880 F. 3d 820 (7th Cir. 2018) ......................................................30, 39, 40

*Trump Taj Mahal Assocs. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.,*
761 F. Supp. 1143 (D.N.J. 1991) .............................................................. 2

*Uscian v. Blacconeri,*
35 Ill. App. 3d 80 (1st Dist. 1975) ............................................................ 43

*Vandevier v. Mulay Plastics, Inc.,*
135 Ill. App. 3d 787 (1st Dist. 1985) ....................................................... 30

*VC Mgmt., LLC v. Reliastar Life Ins. Co.,*
195 F. Supp. 3d 974 (N.D. Ill. 2016) ....................................................... 29

*Vuagniaux v. Korte,*
273 Ill. App. 3d 305 (5th Dist. 1995) ....................................................... 53

## Statutes and Rules

740 ILCS 80/1 ......................................................................................... 48

28 U.S.C. § 1291 ....................................................................................... 3

28 U.S.C. § 1332 ....................................................................................... 1

Fed. R. Civ. P. 56 ..................................................................................... 26

## Other

1 Arthur L. Corbin, *Corbin on Contracts* (1950) ........................................ 27

1 Arthur L. Corbin, *Corbin on Contracts* (1963) ............................................. 28

1 Samuel Williston, *Williston on Contracts* (3d ed. 1957) ................................ 28

Restatement (Second) of Contracts (1981) ...................................................... 28

## JURISDICTIONAL STATEMENT

### I.    The District Court's Jurisdiction

The district court had jurisdiction over this case under 28 U.S.C. § 1332(a)(2). *First*, "the matter in controversy exceeds the sum or value of $75,000," as evidenced by the amount sought in the complaint (Doc. 1, Compl., #5, 6, 8),[1] the amount sought at trial (Doc. 111, Pretrial Order, #4736–37), and the amount awarded in the court's judgment (Doc. 155, Judg., #6063–64 [A48–49]), all of which exceeded $75,000. 28 U.S.C. § 1332(a).

*Second*, "the matter in controversy . . . is between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Thompson Corrugated Systems Inc. ("TCS Inc.") and Thompson Corrugated Systems LLC ("TCS LLC") (together, "TCS") are citizens, respectively, of Illinois and South Carolina. TCS Inc. is incorporated in Illinois and has its principal place of business in Illinois. (Doc. 42, Ans., #160.) TCS LLC is a limited-liability company, organized in South Carolina, whose sole member, Fred Thompson Jr. ("Thompson Jr."), is a citizen of South Carolina. (*Id.*; Doc. 149, Tr., #5690 (580:18–20), #5667 (557:1–2).)

Engico is an Italian società a responsabilità limitata. (Doc. 42, Ans., #160–61.) For diversity purposes, courts have not definitively concluded whether the citizenship of an Italian S.r.l. should be determined based on the

---

[1] "(Doc. [number], [description], #[number])" refers to the district-court document number, a description of the document, and the unique page identifier located at the top of each page in the record. "COA Doc." refers to documents filed in this Court. If a document is included in the required short appendix filed with this brief, the citation also includes the notation "[A__]."

standard for determining the citizenship of a corporation or the standard for determining the citizenship of a limited-liability company. *See, e.g., PGA USA, LLC v. Popi Trading, Inc.*, No. 16–6669, 2016 WL 4261726, at *2–3 (E.D. La. Aug. 12, 2016) (collecting cases). Regardless of which standard applies, Engico is a citizen of Italy.

Engico is organized under the laws of Italy and has its principal place of business in Lissone, Italy. (*Id.*; Doc. 1, Compl., #11; Doc. 147, Tr., #5125–26, 15:24–16:6.) In addition, the ownership interests in Engico are held by Italian citizens. Rinaldo Benzoni ("Benzoni"), an Italian citizen, owns a 40% interest in Engico. (Doc. 147, Tr., #5218 (108:13–15).) Zetacarton, an Italian società per azioni, owns the remaining interest in Engico. (*Id.* at #5218 (108:16–22).)

For diversity purposes, several courts have determined the citizenship of an Italian S.p.A. based on the standard for determining the citizenship of a corporation. *See Extrusion Dies Indus., LLC v. Bielloni Castello S.P.A.*, No. 3:07–CV–583–BBC, 2007 WL 5613511, at *1 (W.D. Wis. Dec. 10, 2007); *Pa. Gear Corp. v. ACSA Steel Forgings, S.P.A.*, No. CIV.A. 02–4359, 2002 WL 32113734, at *1 (E.D. Pa. Nov. 20, 2002); *Trump Taj Mahal Assocs. v. Costruzioni Aeronautiche Giovanni Agusta, S.p.A.*, 761 F. Supp. 1143, 1151 (D.N.J. 1991).

Regardless of which standard applies, Zetacarton is a citizen of Italy. Zetacarton is incorporated under the laws of Italy and has its principal place of business in Senna Comasco, Italy. (COA Doc. #5, Dock. St., Page 3.) In addition, the ownership interests in Zetacarton are held by Italian citizens Giuseppe Zanfrini, Lionella Frigerio, Serena Zanfrini, and Marta Zanfrini. (*Id.*)

## II.     **This Court's Jurisdiction**

This Court has jurisdiction over this case under 28 U.S.C. § 1291. The judgment from which Engico appeals is a "final decision[] of [a] district court[] of the United States." *Id.*

In relevant part, on April 26, 2022, the district court entered an order granting partial summary judgment in favor of TCS on counts I and II of TCS's complaint, which alleged claims, respectively, for breach of contract and violations of the Illinois Sales Representative Act ("ISRA"). (Doc. 95, Order, #4576 [A16].) The court also granted summary judgment in favor of Engico on count IV of the complaint, which alleged a claim for unjust enrichment. (*Id.*)

On July 22, 2022, the district court entered an order awarding compensatory damages to TCS on count I of the complaint. (Doc. 108, Order, #4724 [A24].) On August 29, 2022, a jury rendered a verdict in TCS's favor on counts I and II of the complaint. (Doc. 133, Verdict Form, #4822.)

On September 20, 2022, TCS filed a postjudgment motion seeking prejudgment interest, attorney's fees and costs, and conversion of the jury verdict from euros to dollars. (Doc. 139, Postjudg. Mot., #4916.) On January 17, 2023, the district court granted in part, and denied in part, TCS's postjudgment motion and entered a final judgment, including on count III of the complaint, which alleged a claim for an accounting. (Doc. 154, Order, #6061 [A46]; Doc. 155, Judg., #6063–64 [A48–49].) On February 15, 2023, Engico filed a timely notice of appeal. (Doc. 163, Notice of Appeal, #4916.)

**STATEMENT OF THE ISSUES**

1.      Did the district court err in concluding that there was no genuine issue of material fact regarding the existence and enforceability of an alleged 2004 oral sales-representative agreement between TCS and Engico where the evidence before the court established that the alleged agreement did not contain definite and certain terms regarding the applicable commission rate, the exclusivity of the alleged agreement, the identity of the specific entity that was allegedly entitled to receive commissions, the duration of the alleged agreement, the grounds for terminating the alleged agreement, or the availability of posttermination commissions?

2.      Did the district court err in concluding that there was no genuine issue of material fact regarding the enforceability of an alleged 2018 oral agreement to continue Engico's relationship with TCS until 2021 where Engico properly presented a statute-of-frauds defense in responding to TCS's motion for summary judgment and established that, at a minimum, there was a genuine issue of material fact regarding the applicability of the statute of frauds to the alleged 2018 agreement?

**STATEMENT OF THE CASE**

**I.      The Parties**

TCS Inc. is an Illinois corporation with its principal place of business in Marion, Illinois. (Doc. 42, Ans., #160.) TCS Inc. provides independent manufacturer representation to corrugated-box companies. (*Id.*)

TCS LLC is a South Carolina limited-liability company with its principal place of business in South Carolina. (*Id.*) TCS LLC provides independent manufacturer representation to corrugation-machine builders. (*Id.*)

Engico is a foreign corporation organized under the laws of Italy with its principal place of business in Italy. (*Id.* at #161.) Engico manufactures and sells corrugation machines, which transform flat sheets of corrugated board into boxes. (*Id.*; Doc. 150, Tr., #5733 (623:14–20).)

## II. Nature of the Case

For almost two decades, Engico and TCS attempted to establish a working relationship with one another in connection with Engico's sale of corrugation machines in North America. (Doc. 72, Def.'s MSJ, #233.) Over the years, they discussed, debated, and modified the terms of their relationship but were never able to definitively agree upon those terms, either orally or in writing. (*Id.* at #233, 238.)

After years of trying to work together, TCS filed suit against Engico in the United States District Court for the Southern District of Illinois. (Doc. 1, Compl., #1.) Among other things, TCS's complaint alleged that Engico (1) breached the parties' alleged oral agreement that TCS would act as Engico's exclusive North American sales representative by failing to pay TCS commissions allegedly owed to it under the purported agreement and (2) violated the ISRA by allegedly failing to pay TCS those commissions in a timely manner. (Doc. 1, Compl., #1.)

The district court granted partial summary judgment in favor of TCS on TCS' breach-of-contract and ISRA claims. (Doc. 95, Order, #4576 [A16].) In its summary-judgment order, the court found that, as of 2004, an enforceable oral sales-representative agreement existed between Engico and TCS, rejecting Engico's argument that no enforceable agreement existed because the alleged agreement was missing material terms. (*Id.* at #4567–72 [A7–12].) As a result of this finding, the court concluded that TCS was entitled to recover commissions in connection with Engico's 2019 sale of a new machine to Lawrence Paper Company ("Lawrence Paper"). (*Id.* at #4572 [A12].)

The court further found that commissions on the sale of machines in 2019 and 2020 to two of Engico's other customers, President Container Group ("President Container") and Welch Packaging, would be based on commission terms that may or may not have been implied in the parties' alleged 2004 oral agreement by custom and usage. (*Id.* at #4575 [A15].) It would thus be up to a jury to decide whether Engico owed TCS commissions on these sales based on the parties' testimony at trial regarding custom and usage. (*Id.*)

In granting partial summary judgment to TCS, the court also found that there was no genuine issue of material fact regarding the existence and enforceability of an alleged 2018 oral agreement between the parties to continue Engico's relationship with TCS until 2021, rejecting Engico's argument that the alleged 2018 agreement was unenforceable because it violated the statute of frauds. (*Id.* at #4565, 4575 [A5, A15].) The court concluded that the statute-of-frauds defense "may have [been] waived or

6

forfeited" because it was not pleaded in Engico's answer to TCS's complaint. (*Id.* at #4575 [A15].) The court also concluded that, because the alleged 2018 agreement was terminable at will, it could have been performed within a year and therefore was not barred by the statute of frauds. (*Id.*) In addition, the court concluded that the statute of frauds did not apply because the alleged agreement "was at least partially, if not fully, performed." (*Id.*)

The case ultimately proceeded to trial, where a jury decided in favor of TCS. (Doc. 138, Order, #4913.) At trial, Engico was unable to present evidence that no agreement existed between the parties because the district court had ruled on summary judgment that the parties entered into an enforceable oral agreement in 2004 governing TCS's entitlement to commissions. (Doc. 95, Order, #4569 [A9].) Engico also was unable to present evidence that the parties' alleged 2018 agreement to continue their relationship until 2021 was barred by the statute of frauds because the district court had ruled on summary judgment that the defense may have been waived and, alternatively, that the alleged agreement could have been performed within a year. (*Id.*, #4575 [A15].) Based on the court's summary-judgment rulings, the jury was instructed that an enforceable oral agreement existed, and Engico was barred from presenting evidence to the contrary. (*Id.* at #4569 [A9]; Doc. 151, Tr., #5908 (34:9–11).)

Before this Court, Engico seeks the entry of an order reversing the district court's summary-judgment rulings that (1) the alleged 2004 oral sales-representative agreement between Engico and TCS was valid and enforceable because the terms of the alleged agreement were sufficiently definite and

certain to be given effect by the court, and (2) the alleged 2018 oral agreement to continue the parties' relationship until 2021 was enforceable because Engico waived its statute-of-frauds defense to the alleged agreement, and, alternatively, the statute of frauds did not apply. As set forth below, this Court should reverse those rulings, vacate the district court's judgment, and remand this matter for a new trial.

### III.    Statement of Relevant Facts

#### A.    The Complaint

On January 30, 2020, TCS filed its complaint against Engico alleging claims for breach of contract, violation of the ISRA, accounting, and unjust enrichment. (Doc. 1, Compl., #1–12.) The complaint alleged that, in or around 2002, Engico and TCS entered into an agreement under which TCS would act as Engico's exclusive sales representative in North America. (*Id.* at #2.) The complaint also alleged that, in 2018, the parties confirmed the alleged agreement and agreed to reduce TCS's exclusive territory at a date to be agreed upon in the future (*Id.* at #3.) The complaint further alleged that TCS was entitled to an 8% commission on all sales in the territory, as limited by the new 2018 agreement, including sales to Lawrence Paper and President Container. (*Id.* at #3–4.)

#### B.    The Answer

Engico denied the majority of TCS's allegations pertaining to the alleged oral sales-representative agreement and the alleged 2018 agreement to

continue the parties' relationship until 2021. (Doc. 42, Ans., #161–62.) Enigco

also asserted five affirmative defenses and alleged related facts. (*Id.* at #168.)

Some of the allegations relevant to this appeal are as follows:

- In or around 2002, Engico and TCS discussed entering into an arrangement in which TCS would promote Engico's machines in North America, and TCS would receive commissions in exchange for successful sales due to TCS's direct solicitation and marketing. (*Id.*)

- The parties never executed a written agreement memorializing their discussions. (*Id.*)

- After Engico sold a machine in 2005 to Lawrence Paper, Engico agreed to an 8% commission rate on that sale representing 8% of the purchase price, less turnkey expenses. (*Id.*)

- Engico and TCS agreed to "a sliding commission rate" for the sale of a machine in 2017 to Lawrence Paper's affiliate Jayhawk Boxes Inc. ("Jayhawk Boxes"). (*Id.*)

- Between the 2005 sale and the 2017 sale, Engico and TCS attempted to put the terms of their relationship in writing but were unable to reach an agreement. (*Id.*)

- Throughout the parties' relationship, TCS routinely attempted to increase its commission rate and have it set forth in writing, but Engico never agreed. (*Id.* at #169.)

- In 2019, Lawrence Paper directly approached Engico to buy another machine and stated that it did not wish to engage in any negotiations with TCS, so Engico negotiated the sale itself. (*Id.*)

- Engico agreed to provide TCS its full commission for the Lawrence Paper sale in 2019, but TCS refused to accept the commission because it would not accept Engico's termination of the parties' informal business relationship. (*Id.*)

Engico pleaded several affirmative defenses, including the defense of "termination." (*Id.* at #170–72.) The termination defense alleged that, in 2019, Engico notified TCS that Engico was terminating any purported agreement, and TCS therefore was not entitled to any alleged commissions for machines sold after the purported agreement was terminated. (*Id.* at #170.)

### C.     Summary Judgment

#### 1.     The Factual Record

After conducting discovery, the parties' cross-moved for summary judgment and filed statements of fact. (Doc. 72, Def.'s MSJ, #229–45; Doc. 77, Pls.' MSJ, #3058–74; Doc. 78, Pls.' SOF, #3082; Doc. 83, Def.'s SOF, #3812.) Relevant to this appeal are the facts relating to (1) whether the parties formed an enforceable oral sales-representative agreement in or around 2004 and (2) whether the parties formed an enforceable oral agreement in 2018 to continue their relationship through 2021.

With respect to the parties' alleged 2004 oral agreement, TCS asserted that, in the parties' initial conversations, Engico agreed to a commission rate of 8% on all sales, less transportation and installation costs, in exchange for TCS's representation of Engico in North America. (Doc. 78, Pls.' SOF, #3082–83 (¶ 37).) According to TCS, these conversations involved Benzoni, on behalf of Engico, and Fred Thompson Sr. ("Thompson Sr."), on behalf of TCS. (*Id.*)

Engico, by contrast, asserted that, in 2004, TCS proposed commissions ranging from 5% to 8% based on the type of company to which one of its machines was sold. (Doc. 83, Def.'s SOF, #3804 (¶ 8).) According to Engico,

10

TCS transmitted a memo to outline the terms from this discussion. (*Id.*) Engico did not agree to these terms but did agree to let TCS help market Engico's machines. (*Id.* at #3805 (¶¶ 13, 16).) Engico repeatedly stated that any commission would be paid on a case-by-case basis depending on the particular deal in question. (*Id.* at #3805–06 (¶ 16).) The memo circulated by TCS did not say anything about termination, duration, exclusivity, or posttermination commissions. (*Id.* at #3805 (¶ 11).)

In 2011 and 2012, both parties discussed a sliding scale of commission percentages. (Doc. 78, Pls.' SOF, #3086–87 (¶ 56); Doc. 83, Def.'s SOF, #3806 (¶ 19).) TCS maintained that the parties agreed to a sliding scale for the sales of Engico's next three machines. (Doc. 78, Pls.' SOF, #3086–87 (¶ 56).) Engico, for its part, presented evidence that no final agreement was ever reached because Engico tentatively agreed to the sliding-scale framework but stated that it would continue to determine the commission for each sale on a case-by-case basis. (Doc. 83, Def.'s SOF, #3807 (¶ 23).) According to TCS, an email it sent to Engico confirmed that the parties agreed to a sliding scale. (Doc. 78, Pls.' SOF, #3087 (¶ 24).) According to Engico, an email it sent to TCS reaffirmed that commissions were not set. (Doc. 83, Def.'s SOF, #3807 (¶ 23).)

Regarding the purported 2018 oral agreement to continue the parties' relationship through 2021, TCS cited the depositions of Benzoni, Thompson Jr., and Thompson Sr., stating:

> On February 9, 2018, [Thompson Sr.] met with Benzoni in Charlotte, North Carolina. At that meeting, Benzoni and [Thompson Sr.] agreed that TCS would remain Engico's exclusive sales representative in North America until [Thompson Sr.] retired

at the end of 2021. Benzoni and [Thompson Sr.] agreed at that time that TCS would continue to receive commissions on all sales in North America through 2021.

(Doc. 78, Pls.' SOF, #3088–89 (¶ 63).)

Both TCS and Engico asserted in their statements of facts that Engico informed TCS in July 2019 that Engico intended to terminate the parties' relationship (Doc. 78, Pls.' SOF, #3093 (¶ 91); Doc. 83, Def.'s SOF, #3812 (¶¶ 49–50).) Both parties also asserted that, in August 2019, Benzoni met with Thompson Sr. at the offices of Haire Group ("Haire"), Engico's new sales representative, where Benzoni told Thompson Sr. that, at the end of 2019, Engico would terminate its relationship with TCS. (Doc. 78, Pls.' SOF, #3093 (¶ 92); Doc. 83, Def.'s SOF, #3812 (¶ 52).) Engico had retained Haire not only because of Haire's capabilities as a sales representative, but also because of its experience as a broker and reseller of used corrugation machines and its operation of a fully staffed service department. (Doc. 82, Def.'s SOF, #3187 (¶ 55).)

The parties disputed whether, at the August 2019 meeting, Benzoni stated that Engico would not pay TCS a commission for the 2019 sale to Lawrence Paper. (Doc. 78, Pls.' SOF, #3093 (¶ 92); Doc. 83, Def.'s SOF, #3812 (¶ 52).) According to TCS, Benzoni refused to pay the commission. (Doc. 78, Pls.' SOF, #3093 (¶ 92).) Engico, by contrast, cited evidence establishing that, at the meeting, Benzoni offered TCS a sliding-scale commission on the sale to Lawrence Paper, which Thompson Sr. rejected. (Doc. 83, Def.'s SOF, #3812 (¶¶ 50–51).)

12

## 2.    Engico's Motion for Summary Judgment

In Engico's motion for partial summary judgment, Engico argued, in relevant part, that (1) no valid, enforceable agreement existed between the parties because the alleged 2004 oral agreement was missing material terms; (2) no valid, enforceable agreement existed between the parties because the Manufacturer's Association National Code of Ethics (the "MANA Code") controlled the parties' relationship, and the MANA Code required the parties to enter into a clearly worded written agreement; and (3), because Engico terminated its relationship with TCS on September 10, 2019, Engico's sales to Welch Packaging through Haire, and to President Container, were not "commissionable." (Doc. 72, Def.'s MSJ, #229–45.)

Engico explained that, despite the parties' best efforts over the years, they had failed to reach an agreement, and TCS should not be allowed to piece together a series of discussions, and proposed terms that were never accepted, to establish the existence of a valid, enforceable oral agreement. (*Id.* at #239.) Engico pointed out that various material terms, including which plaintiff was owed a commission, the duration of the alleged agreement, the grounds for terminating the alleged agreement, and the availability of posttermination commissions, had never been discussed or defined. (*Id.*) The commission rate itself was even a point of contention and disagreement. (*Id.*) Engico also emphasized that the parties had never agreed upon what would constitute a commissionable sale. (*Id.*) Because of these missing terms, the parties had not entered into a valid, enforceable oral agreement. (*Id.* at #240.)

13

Engico further argued that the sale to Welch Packaging through Haire, and the sale to President Container, were not commissionable, because Engico terminated its relationship with TCS on September 10, 2019. (*Id.* at #243.) Engico informed TCS on September 10, 2019, that Engico would be terminating the parties' relationship, effective December 31, 2019, and that TCS's representation of Engico would not be exclusive in the interim period. (*Id.*) The sale to Haire that resulted in the sale to Welch Packaging occurred on January 23, 2020, which was after Engico had terminated its relationship with TCS. (*Id.*) Engico entered into a written agreement for the sale to President Container on October 30, 2019, which was after Engico informed TCS that TCS's representation of Engico was no longer exclusive. (*Id.*)

In response, TCS argued that because Engico and TCS continued their informal business relationship with one another, the terms of the alleged agreement could not have been uncertain. (Doc. 70, Pls.' MSJ Resp., #3105.) TCS further argued that the commission structure was set and agreed upon, despite the evidence that Engico never agreed to TCS's attempts to formalize the agreement in writing. (*Id.* at #3106.) TCS stated that nothing about the terms of the parties' alleged agreement was "malleable," despite the parties' repeated failed attempts to put the agreed terms in writing. (*Id.*) TCS also argued that, in the parties' alleged 2018 agreement, they had agreed to terminate their relationship at the end of 2021. (*Id.* at #3110.)

In its reply, Engico argued that there could not have been an agreement between the parties because, in 2016, TCS conditioned its continued

relationship with Engico upon reducing the terms of the parties' relationship to writing. (Doc. 87, Def.'s MSJ Reply, #4473.) It was undisputed that TCS introduced new terms, which Engico rejected, and attempted to put these terms in writing, which Engico never accepted. (*Id.*) Therefore, no oral agreement existed after 2016 because TCS's own condition precedent was not satisfied. (*Id.* at #4474.)

### 3.     TCS's Motion for Summary Judgment

In TCS's motion for summary judgment, TCS argued that (1) Engico did not dispute the existence of an oral agreement between the parties, (2) Engico breached the alleged agreement, and (3) Engico violated the ISRA. (Doc. 77, Pls.' MSJ, #3058–74.) In TCS's view, the terms of the parties' agreement were definite enough to be enforced by the court. (*Id.* at #3063–64.)

Specifically, TCS argued that Engico confirmed the parties' alleged agreement by paying TCS an 8% commission in 2005 in connection with Engico's sale of a machine to Lawrence Paper and by paying TCS a sliding-scale commission in 2017 in connection with Engico's sale of a machine to Jayhawk Boxes, Lawrence Paper's affiliate. (*Id.* at #3064.) TCS claimed that Engico breached the parties' alleged agreement by failing to pay TCS commissions for Engico's 2019 sale to Lawrence Paper, Engico's 2019 sale to President Container, and Engico's 2020 sale to Welch Packaging through Haire. (*Id.* at #3066–70.) TCS also argued that Engico willfully and wantonly violated the ISRA by refusing to pay TCS in a timely manner. (*Id.* at #3071.)

In response, Engico argued that TCS and Engico were never able to agree to contract terms. (Doc. 81, Def.'s MSJ Resp., #3158.) Engico cited the parties' disputes over commission rates, the redlined draft agreements that were never accepted, and the parties' disagreements concerning replacement parts and defined territories. (*Id.* at #3161–62.)

Engico further argued that the parties' alleged 2018 oral agreement was unenforceable because it violated the statute of frauds (*Id.* at #3170.) The alleged agreement was based on a February 9, 2018, meeting between Benzoni and Thompson Sr. in which the parties discussed continuing their relationship until the end of 2021, when Thompson Sr. intended to retire. (*Id.* at #3171.) No valid, enforceable agreement existed because the alleged agreement, which was not in writing and could not be performed within a year, was barred by the statute of frauds. (*Id.*)

In its reply, TCS argued that Engico waived its statute-of-frauds argument. (Doc. 86, Pls.' MSJ Reply, #4462.) TCS also argued that, because TCS spent money promoting Engico, TCS's partial performance barred the application of the statute of frauds. (*Id.*) In addition, TCS continued to argue that the facts surrounding the alleged sales-representative agreement between TCS and Engico were not in dispute, and an enforceable oral contract existed. (*Id.* at #4467.)

### 4.   The Summary-Judgment Order

On April 26, 2022, the district court granted partial summary judgment in favor of TCS on TCS' breach-of-contract and ISRA claims. (Doc. 95, Order,

16

#4576 [A16].) The court found that, as of 2004, an enforceable oral sales-representative agreement existed between Engico and TCS, rejecting Engico's argument that no enforceable agreement existed because the alleged agreement was missing material terms. (*Id.* at #4567–72 [A7–12].) As a result of this finding, the court concluded that TCS was entitled to recover commissions in connection with Engico's 2019 sale of a corrugation machine to Lawrence Paper. (*Id.* at #4572 [A12].)

The court also found that there was no genuine issue of material fact regarding the existence and enforceability of the alleged 2018 oral agreement between the parties to continue Engico's relationship with TCS until 2021. (*Id.* at #4575 [A15].) The court concluded that Engico may have waived its statute-of-frauds defense by failing to plead the defense in its answer. (*Id.*) The court also concluded that the alleged 2018 agreement was not barred by the statute of frauds because it was terminable at will and therefore could have been performed within a year. (*Id.*) In addition, the court concluded that the alleged 2018 agreement was not barred by the statute of frauds because the alleged agreement "was at least partially, if not fully, performed." (*Id.*)

With respect to the commissions Engico allegedly owed TCS for Engico's sales to Welch Packaging through Haire, and to President Container, the court found that it would be up to a jury to decide whether Engico owed TCS these commissions based on terms that may or may not have been implied in the parties' alleged 2004 oral agreement by custom and usage. (*Id.*) As a result, the limited aspects of the case that remained at issue proceeded to a jury trial.

17

**D.     The Trial**

The trial, which occurred from August 22, 2022, through August 29, 2022, included testimony from TCS Inc.'s owner, Thompson Sr.; TCS LLC's owner, Thompson Jr.; TCS's expert, Scott Lindberg ("Lindberg"); Engico's managing director, Benzoni; Engico's sales engineer, Daniele Mazzola ("Mazzola"); and Engico's expert, Lance Head. The testimony relevant to this is appeal relates to (1) the terms of the parties' alleged 2004 oral sales-representative agreement and (2) the terms of the parties' alleged 2018 oral agreement to continue working together through the end of 2021.

**1.     Testimony Regarding the Alleged 2004 Agreement**

With respect to the terms of the parties' alleged 2004 agreement, Benzoni testified that Engico's relationship with TCS began after the two companies were introduced in 2002. (Doc. 147, Tr., #5226–27 (116:25–117:7).)  Engico and TCS entered into a "gentleman's agreement" under which TCS could represent Engico in North America and would be paid a maximum commission rate of 8%. (*Id.*) This "gentleman's agreement" was never put into writing. (*Id.* at #5229 (119:1–10).)

Benzoni further testified that Engico paid TCS a commission of 8% in connection with Engico's 2005 sale to Lawrence Paper, after which the parties agreed to try a sliding scale for commission rates, where the commission would decrease by 1% for each million euros of the sale price. (*Id.* at #5268 (158:11–16), 5242 (132:14–17).) Benzoni acknowledged that the MANA Code was attached to emails sent by TCS but stated that he never read it, and did not

18

need to do so, because there was no written, formal agreement, under the MANA Code or otherwise, between Engico and TCS. (*Id.* at #5258–61 (148:4–151:19).)

Thompson Sr. testified that Engico never entered into a fair and clearly worded agreement with TCS. (Doc. 148, Tr., #5432 (322:10–12).) In Thompson Sr.'s view, Engico had accepted the MANA Code and had therefore accepted the terms of the MANA Code. (*Id.* at #5432 (322:12–18).) He believed the MANA Code would fill in the gaps of anything Engico had not clearly agreed to, including termination conditions. (*Id.*)

On cross-examination, Thompson Sr. was unable to specify when Engico and TCS reached a final agreement. (Doc. 149, Tr., #5531–35 (421:21–425:20).) He stated that he knew the parties had reached an agreement because Engico started sending TCS what Thompson Sr. considered to be "proprietary information." (*Id.* at #5533 (423:9–18).)

Lindberg, TCS's expert witness, testified regarding industry custom and practice for sales representatives. (*Id.* at #5643 (533:10–17).) According to Lindberg, representatives typically get paid for every sale within a particular territory. (*Id.* at #5614 (504:12–05:9).) Lindberg acknowledged, however, that oral sales-representative agreements are uncommon. (*Id.* at #5633 (523:21–24).)

Thompson Jr. testified that, in 2017, he sent emails to Mazzola attempting to modify the parties' commission rate. (*Id.* at #5700–03 (590:11–

593:4).) Mazzola declined to do so, and the parties were not able to finalize a written agreement. (*Id.*)

Mazzola testified that Engico exchanged numerous emails with TCS about the proposed written agreement. (Doc. 150, Tr., #5379–41 (629:10–631:22).) Because the parties could not agree upon terms, no agreement was ever reduced to writing. (*Id.*)

### 2.     Testimony Regarding the Alleged 2018 Agreement

With respect to the 2018 agreement to continue the parties' relationship until the end of 2021, Benzoni testified that he and Thompson Sr. met in North Carolina in February 2018, where Thompson Sr. talked about his potential retirement, and the parties orally agreed they would work together until the end of 2021, which would presumably be when Thompson Sr. retired. (Doc. 148, Tr., #5358–59 (248:16–49:2).) Benzoni stated that Thompson Sr. told him to put this agreement in writing, but Benzoni did not, and he was not aware that anyone else did. (*Id.* at #5361–62 (251:21–52:20).) Benzoni further testified that, on May 14, 2019, he called Thompson Sr. to tell him Engico's relationship with TCS would be ending. (*Id.* at #5364 (254:1–5).)

Thompson Sr. testified that, when the parties met in February 2018, he and Benzoni discussed how their relationship would look going forward due to potential changes in Engico's ownership. (Doc. 148, Tr., #5453–54 (343:14–44:19).) Thompson Sr. stated that TCS and Engico agreed they would continue to work together through the end of 2021, when Thompson Sr. planned to retire. (*Id.*) On cross-examination, Thompson Sr. acknowledged that Engico had

the legal right to terminate the agreement at any time. (*Id.* at #5561–63 (451:17–53:11).)

### E. The Jury Instructions and Verdict

After the parties rested their cases, the district court instructed the jury. (Doc. 151, Tr., #5902 (792:20–25).) In its instructions on count I, the court stated, based on its summary-judgment rulings, that it had "already determined that there was an enforceable oral contract between TCS and Engico." (*Id.* at #5908 (798:9–11).) Because the court had determined that there was an enforceable oral contract between the parties, the instructions stated that Engico "admitted" that the contract contained terms reflecting that (1) "TCS would be Engico's sales representative in North America"; (2) "TCS would promote Engico's products in North America;" and (3) "[a]fter 2012, Engico would pay TCS a commission for 6% for the first million euros of the sales price, 5% for the next million, 4% for the next million, and 3% for anything exceeding 3 million euros." (*Id.* at #5910 (800:6–15).)

Similarly, in its instructions on count II, the court stated, based on its summary-judgment rulings, that it had "decided to accept as proved the fact that TCS and Engico had a binding oral contract and that under the contract Engico owed TCS a commission of 180,000 euros for the Lawrence Paper sale." (*Id.* at #5914–15 (804:25–805:4).) As a result, the court instructed the jury to "now treat these facts as having been proved for the purpose of this case." (*Id.* at #5915 (805:4–6).)

After deliberating, the jury returned a verdict in favor of TCS on counts I and II of TCS's complaint. (Doc. 133, Verdict Form, #4822–24.) On count I, TCS's breach-of-contract claim, the jury awarded TCS €192,000 in compensatory damages for Engico's sale to President Container and €96,000 in compensatory damages for Engico's sale to Welch Packaging through Haire. (*Id.* at #4822.) On count II, TCS's claim for violations of the ISRA, the jury awarded TCS €120,000 in exemplary damages for Engico's sale to Lawrence Paper, €60,000 in exemplary damages for Engico's sale to President Container, and €120,000 in exemplary damages for Engico's sale to Welch Packaging through Haire. (*Id.* at #4823.)

**F.    The Final Judgment**

On January 17, 2023, the district court entered a final judgment in this matter. (Doc. 155, Judg., #6063–64 [A48–49].) The court (1) converted the amounts awarded by the jury from euros to dollars, (2) entered judgment on the jury verdict, (3) awarded TCS prejudgment interest, (4) dismissed count III of the complaint (accounting) with prejudice, and (5) awarded TCS attorney's fees and costs under the ISRA. (*Id.;* Doc. 154, Order, #6040–62 [A25–47].) This appeal followed. (Doc. 163, Notice of Appeal, #4916.)

**SUMMARY OF ARGUMENT**

By suing Engico, TCS sought to profit from the lack of clarity in a limited relationship that Engico never agreed to expand beyond case-by-case, sale-by-sale determinations regarding whether, and to what extent, TCS was entitled to receive commissions from Engico. TCS's efforts succeeded. Despite TCS's

involvement in just two sales of Engico's machines from 2002 through 2018, TCS was awarded $521,750 in compensatory damages, $334,122.00 in exemplary damages, and $518,908.84 in attorney's fees and costs, plus prejudgment interest, in connection with three sales from 2019 through 2020 that TCS admittedly had no active role in procuring. (Doc. 155, Judg., #6063–64 [A48–49].)

Rather than allowing a jury to decide whether a valid, enforceable sales-representative agreement existed between Engico and TCS between 2002 and 2018, the district court erroneously removed this issue from the jury's consideration and improperly limited Engico's ability to defend itself against TCS's claims. In addition, rather than allowing the jury to decide whether the parties' alleged 2018 agreement to continue their relationship until 2021 should have been memorialized in writing, the district court erroneously determined that (1) Engico waived its statute-of-frauds defense, and (2) the alleged 2018 agreement was not barred by the statute of frauds.

This Court should reverse the district court's summary-judgment ruling that the alleged 2004 oral sales-representative agreement between Engico and TCS was valid and enforceable because the terms of the alleged agreement were sufficiently definite and certain to be given effect by the court. This Court should also reverse the district court's summary-judgment ruling that the alleged 2018 oral agreement to continue the parties' relationship until 2021 was enforceable because Engico waived its statute-of-frauds defense to the alleged agreement, and, alternatively, the statute of frauds did not apply.

*First*, the district court erred in ruling that there was no genuine issue of material fact regarding the existence and enforceability of the alleged 2004 oral sales-representative agreement. Under Illinois law, no contract exists if the terms of an alleged agreement are not sufficiently definite and certain to reflect a meeting of the parties' minds. The question whether a valid contract has been formed is one for the jury, unless the court decides that the facts surrounding contract formation are not in dispute.

Here, the evidence before the district court established that the alleged 2004 sales-representative agreement did not contain definite and certain terms regarding the applicable commission rate, the exclusivity of the alleged agreement, the identity of the specific entity that was allegedly entitled to receive commissions, the duration of the alleged agreement, the grounds for terminating the alleged agreement, or the availability of posttermination commissions. Rather than resolving the issues of fact regarding these terms in TCS's favor on summary judgment, the court should have allowed the jury to decide whether the parties had formed an agreement.

*Second*, the district court erred in ruling that (1) Engico waived its statute-of-frauds defense to the parties' alleged 2018 agreement, and (2) the statute of frauds did not apply. Engico did not waive it statute-of-frauds defense because this Court's case law allows a party to raise a statute-of-frauds defense for the first time on summary judgment; TCS had a full and fair opportunity to respond to the statute-of-frauds defense in its summary-judgment briefing; and the defense was raised over eight months before trial. In

addition, although Engico did not expressly plead the statute of frauds in its answer, the answer put TCS on notice that the absence of a written agreement between the parties was at issue in this case.

Moreover, the issue whether the alleged 2018 agreement was capable of being performed within one year of its formation was, at a minimum, a question of fact that should have been submitted to the jury. The alleged agreement was for a period of over three years, from February 2018 until December 31, 2021. The district court erroneously concluded that the alleged agreement could have been performed within a year because it was terminable at will. Instead, because the alleged agreement had a fixed term, it was subject to the statute of frauds and should have been placed in writing to be enforceable. The complete-performance exception to the statute of frauds does not apply because the alleged agreement was not fully performed. The partial-performance exception to the statute of frauds likewise does not apply because that exception does not apply to actions for damages, such as this case.

## **STANDARD OF REVIEW**

A district court's order granting summary judgment is subject to de novo review. *Kluge v. Brownsberg Cmty. Sch. Corp.*, __ F.4th __, 2023 WL 2821871, at *13 (7th Cir. Apr. 7, 2023); *Berg v. N.Y. Life Ins. Co.*, 831 F.3d 426, 428 (7th Cir. 2016). In reviewing a grant of summary judgment, this Court "examine[s] the record in the light most favorable to the party opposing judgment" and "constru[es] all reasonable inferences from the evidence in [that party's] favor." *Kluge*, 2023 WL 2821871, at *13.

Summary judgment "is appropriate only when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law." *Berg*, 831 F.3d at 428; Fed. R. Civ. P. 56(a). "[S]ince the review of summary judgment is plenary, errors of analysis by the district court are immaterial," and a reviewing court "ask[s] whether [it] would have granted summary judgment on th[e] record" before it. *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 386 (7th Cir. 2000). In that regard, this Court's review of an order granting summary judgment is "without deference for the view of the district judge and . . . almost as if the motion had been made directly to [this Court]." *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993).

Partially dispositive nonfinal orders "become appealable after a final decision is entered." *Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 800 (7th Cir. 2000). This includes partial summary-judgment orders, which remain reviewable after a case proceeds to trial and a final judgment is entered. *See Janky v. Lake Cnty. Visitors & Convention Bureau*, 576 F.3d 356, 359 (7th Cir. 2009) (order partially granting summary judgment was reviewable after entry of final judgment upon denial of motion for new trial or remittitur).

## **ARGUMENT**

I.  **The district court erred in concluding that there was no genuine issue of material fact regarding the existence and enforceability of the alleged 2004 oral sales-representative agreement between TCS and Engico.**

On summary judgment, the district court ruled that an enforceable oral agreement existed between TCS and Engico, finding that, in 2004, the parties

entered into an oral sales-representative agreement because the terms of the alleged agreement were sufficiently definite and certain to be given effect by the court. (Doc. 95, Order, #4572 [A12].) The court erred in doing so.

### A. Under Illinois law, no contract exists if the terms of an alleged agreement are not sufficiently definite and certain to reflect a meeting of the parties' minds.

Under Illinois law, "[t]o succeed on a breach of contract claim, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Sols., Inc.*, 2022 IL 127903, ¶ 28. The "basic requirements" of a valid, enforceable contract are "the existence of an offer, acceptance, and consideration" and "mutual assent to the contract's terms." *Arbogast v. Chi. Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20.

Illinois courts often refer to "mutual assent" as "a meeting of the minds." *See Acad. Chi. Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991); *Midland Hotel Corp v. Reuben H. Donnelly Corp.*, 118 Ill. 2d 306, 313 (1987). For a meeting of the minds to occur between transacting parties, they must "'express [their] assent to the identically same terms.'" *Arbogast*, 2021 IL App (1st) 210526, ¶ 20 (quoting 1 Arthur L. Corbin, *Corbin on Contracts*, § 11, at 23 (1950)). In the absence of "definite and certain essential terms required for the formation of an enforceable contract," no contract exists. *Cheever*, 144 Ill. 2d at 29.

Put differently, "[a]lthough the parties may have had and manifested the intent to make a contract, if the content of their agreement is unduly uncertain

27

and indefinite no contract is formed." *Id.* (citing 1 Samuel Williston, *Williston on Contracts*, § 37 (3d ed. 1957); 1 Arthur L. Corbin, *Corbin on Contracts*, § 95 (1963)); *see also Carlton at the Lake, Inc. v. Barber*, 401 Ill. App. 3d 528, 531 (1st Dist. 2010) (stating that forming a valid contract requires "offer and acceptance, consideration, *and definite and certain terms*") (emphasis added).

The reason for requiring definite and certain terms to form an enforceable contract "is obvious[:] '[a] court cannot enforce a contract unless it can determine what it is.'" *Abrams v. Ill. Coll. of Podiatric Med.*, 77 Ill. App. 3d 471, 476 (1st Dist. 1979) (quoting 1 Arthur L. Corbin, *Corbin on Contracts*, § 95, at 394 (1963)). To that end, even if the parties have "'actually agreed'" with one another, "'if their expressions, when interpreted in the light of the accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are,'" then no valid, enforceable contract exists. *Id.* (same).

Although "[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon, . . . if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Cheever*, 144 Ill. 2d at 30. As set forth in the Restatement (Second) of Contracts, which Illinois courts have adopted, "[t]he fact that one or more terms of a proposed bargain are left open or uncertain" may show that no meeting of the minds occurred. Restatement (Second) of Contracts § 33 (1981); *Cheever*, 144 Ill. 2d at 30 (citing Restatement).

28

These authorities firmly establish that, under Illinois law, no contract exists if the terms of an alleged agreement are not sufficiently definite and certain to reflect a meeting of the parties' minds. As discussed in further detail below, whether a meeting of the minds occurred between Engico and TCS was a question of fact the district court should have allowed the jury to decide.

### B. The existence of a sales-representative agreement between Engico and TCS was a question of fact for the jury to decide.

"Whether a contract exists, its terms, and the parties' intent are questions of fact to be determined by the trier of fact." *Pepper Constr. Co. v. Palmolive Towers Condos., LLC*, 2016 IL App (1st) 142754, ¶ 81. "[O]nly when no factual dispute exists does the issue of a contract's existence become a question of law for the court." *Arbogast*, 2021 IL App (1st) 210526, ¶ 19. As a result, "[w]hether the evidence is sufficient to establish the existence of the elements required to form a contract is generally a question to be determined by the trier of fact." *VC Mgmt., LLC v. Reliastar Life Ins. Co.*, 195 F. Supp. 3d 974, 985 (N.D. Ill. 2016) (internal quotation marks omitted).

Because the facts surrounding Engico and TCS's alleged sales-representative agreement were disputed, the question whether an agreement existed between them should have been determined by the jury. *See Arbogast*, 2021 IL App (1st) 210526, ¶ 19; *Pepper, LLC*, 2016 IL App (1st) 142754, ¶ 81; *VC Mgmt.*, 195 F. Supp. 3d at 985. The district court committed reversible error by "usurp[ing] the jury's role" regarding this issue. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004).

### 1.    The district court mischaracterized Engico's position regarding oral agreements.

As an initial matter, Engico does not dispute that an oral agreement can be enforced under Illinois law. (Doc. 81, Def.'s MSJ Resp., #3163–64.) The district court incorrectly framed its summary-judgment order as though Engico disputed this point. (Doc. 95, Order, #4567 [A7].)

Critically, however, "[t]he requirement of definiteness applies with equal or greater force to oral contracts." *Perez v. Abbott Labs.*, No. 94 C 4127, 1995 WL 86716, at *8 (N.D. Ill. Feb. 27, 1995). As with written agreements, "in order for an oral contract to be binding and enforceable, its terms must be definite and certain" for a "meeting of the minds" to occur. *Vandevier v. Mulay Plastics, Inc.*, 135 Ill. App. 3d 787, 791 (1st Dist. 1985).

Illinois state and federal courts consistently find that no contract exists if an alleged oral agreement lacks definite and certain terms. *See, e.g., Abrams*, 77 Ill. App. 3d at 476 (affirming judgment on the pleadings on breach-of-contract claim where the "vagueness and indefiniteness" of the promisor's obligations under an alleged oral agreement with the promisee "prevent[ed] the creation of a binding and enforceable oral contract"); *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 829–30 (7th Cir. 2018) (affirming summary judgment on breach-of-contract claim where alleged oral agreement "was not sufficiently definite as to duration, a material term," and there was no meeting of the minds); *Ne. Ill. Reg'l Commuter Ry. Corp. v. Kiewit W. Co.*, 396 F. Supp. 2d 913, 920–21 (N.D. Ill. 2005) (granting summary judgment on breach-of-

contract claim where alleged oral agreement was "too vague and indefinite" with respect to "essential" term of price "to create a binding and enforceable oral contract"); *Perez*, 1995 WL 86716, at *8 (dismissing breach-of-contract claim based on alleged oral agreement where "numerous negotiations took place but no agreements were finalized," including "the basic material terms of the[] purported agreements").

Even where, as here, the parties periodically exchange writings over the course of their relationship, the same rigid requirements of definiteness and certainty apply. *See, e.g., Cheever*, 144 Ill. 2d at 29 (reversing bench-trial judgment on claim that written publishing agreement was valid and enforceable where "major unresolved uncertainties" existed regarding essential terms of alleged agreement); *Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 850–52 (7th Cir. 2007) (affirming summary judgment on breach-of-contract claim where alleged written agreement was "lacking in definiteness and certainty" on "essential" term of "performance obligations"); *Sloger v. Midwest Med. Supply Co.*, No. 04–CV–291–WDS, 2006 WL 288137, *3 (S.D. Ill. Feb. 6, 2006) (granting summary judgment on breach-of-contract claim where alleged written agreement was "vague and indefinite" with respect to "essential" term of commission structure, and there was no meeting of the minds); *Ken–Pin, Inc. v. Vantage Bowling Corp.*, No. 02–cv–7991, 2004 WL 783092, *3–4 (N.D. Ill. Jan. 20, 2004) (dismissing breach-of-contract claim where alleged written agreement was "neither sufficiently definite nor certain with respect to numerous essential terms," including "the duration of the contract, the

31

geographical area involved, the pricing scheme, the nature and extent of incidental services to be performed, standards of performance, or the means of termination").

The district court ignored this extensive body of case law in finding that there was no genuine issue of material fact regarding the existence of a valid, enforceable oral sales-representative agreement between Engico and TCS as of 2004.

### 2. The district court resolved multiple factual disputes in TCS's favor.

The summary-judgment record established multiple factual disputes regarding the alleged contractual terms between Engico and TCS. First and foremost, throughout the duration of their relationship, Engico and TCS disagreed on the commission rates Engico would pay to TCS. Commission rates are an essential term in a sales-representative agreement. *See Anderson v. Fel– Pro Chem. Prods., L.P.*, No. 95 C 4604, 1996 WL 33410082, at *6 (N.D. Ill. Dec. 19, 1996) (stating that "commission structure" is an "essential" term of a sales-representative agreement); *see also Sloger*, 2006 WL 288137, at *3 (finding that "essential" commission term of alleged contract was "vague and incomprehensible").

Before the district court, TCS claimed that, at the outset of the parties' relationship, Engico agreed to an 8% commission rate on all sales. (Doc. 78, Pls.' SOF, #3082–83 (¶¶ 36–38).) Engico, for its part, established that TCS proposed commission rates ranging from 5% to 8% based on the type of company to which a machine was sold. (Doc. 83, Def.'s SOF, #3804 (¶ 8); Doc.

84, Def.'s Resp. to Pls.' SOF, #4436–37 (¶¶ 36–38).) TCS sent a memo to Engico outlining TCS's proposed terms, but Engico did not sign this memo or otherwise agree to the terms, repeatedly stating that the commission rates would be determined on a case-by-case basis. (Doc. 83, Def.'s SOF, #3804–05 (¶¶ 8–13), 3807 (¶¶ 22–23).)

In 2011 and 2012, the parties discussed a sliding-scale arrangement for commission percentages. (Doc. 78, Pls.' SOF, #3087 (¶ 58); Doc. 83, Def.'s SOF, #3806 (¶ 19); Doc. 84, Def.'s SOF Resp., #4442–43 (¶ 58).) While TCS believed that this sliding-scale arrangement would be used for the next three machines, Engico submitted evidence establishing that, although it tentatively agreed to the sliding-scale arrangement, it simultaneously emphasized that the commission for each sale would still be on a case-by-case basis. (Doc. 78, Pls.' SOF, #3086–87 (¶ 56); Doc. 83, Def.'s SOF, #3806–07 (¶¶ 19–23); Doc. 84, Def.'s SOF Resp., #4442 (¶ 56).) Again, no finalized written agreement was ever reached. (Doc. 83, Def.'s SOF, #3806–07 (¶¶ 19–23).)

Contrary to TCS's assertions, Engico did not confirm a commission rate of 8% by paying TCS's invoice for the 2005 sale to Lawrence Paper. (Doc. 79, Pls.' MSJ Resp., #3106.) Although TCS tried to establish that this payment set a standard between the parties, in reality, Engico only paid this 8% commission rate once during the parties' entire 17-year relationship. (Doc. 83, Def.'s SOF, #3806, (¶¶ 18–19).) Throughout the relationship, the parties discussed the commission that would be paid for each sale. (*Id.* at #3807 (¶¶ 19–23).) They did not reach an agreement on the commission rate, as further

33

evidenced by their failure to memorialize an agreement on the rate in writing. (*Id.* at #3811 (¶ 42).) *See, e.g., Midland Distrib., Inc. v. Zest US Wholesale, Inc.*, No. 21 C 1403, 2021 WL 4745265, at *5–6 (N.D. Ill. Oct. 12, 2021) (finding that "the parties' failure to formalize [their] agreement" supported the conclusion that no agreement was formed).

The parties also did not reach an agreement on exclusivity, another material term of the alleged contract. *See Canteen Corp. v. Former Foods, Inc.*, 238 Ill. App. 3d 167, 181–82 (1st Dist. 1992) (acknowledging that exclusivity can be an essential contractual term). Despite the district court's sweeping generalization that "Engico admit[ted] that in 2004 there was an oral agreement that TCS would be its exclusive North American sales representative" (Doc. 95, Order, #4568), Engico repeatedly denied entering into an "exclusive" relationship with TCS and tendered evidence demonstrating that it only agreed to work with TCS on a case-by-case basis. (Doc. 83, Def.'s SOF, #3805–06 (¶¶ 11, 16); Doc. 84, Def.'s SOF Resp., #4436 (¶ 37); *see also* Doc. 83, Def.'s SOF, #3807 (¶ 24), 3809–10 (¶¶ 37–41); Doc. 84, Def.'s SOF Resp., #4434–35 (¶¶ 25–26), 4442 (¶ 56), 4444 (¶¶ 61–62).) The rationale for Engico's case-by-case approach was that Engico had limited experience with sales in North America and wished to leave itself room to explore the terms for selling its machines in that market. (Doc. 83, Def.'s SOF, #3805–06 (¶ 16).)

The parties also never reached an agreement regarding the identity of the specific entity that was allegedly entitled to receive commissions, the duration of the alleged contract, the grounds for terminating the alleged contract, or the

availability of posttermination commissions, all of which were material terms. (Doc. 83, Def.'s SOF, #3805–06, (¶¶ 11–12, 17).) *See Anderson*, 1996 WL 33410082, at *6 (discussing the "essential" terms of a sales-representative agreement, including but not limited to "the commission structure" and "the duration of the agreement and/or a termination provision"); *Brown v. Goodman*, 147 Ill. App. 3d 935, 940 (1st Dist. 1986) (stating that "the essential terms of [a] contract" include "the identity of the parties"). The memo sent by TCS that supposedly outlined the proposed terms of the agreement did not even mention duration, termination, posttermination commissions, or that two companies—TCS Inc. and TCS LLC—purportedly would be representing Engico. (Doc. 83, Def.'s SOF, #3806 (¶¶ 11–12, 17).)

Despite this evidence, the district court cited several grounds for concluding that a valid, enforceable sales-representative agreement existed between Engico and TCS as of 2004, none of which withstand scrutiny. (Doc. 95, Order, #4571–72 [A11–12].) *First*, although the district court concluded that it was "clear that the 2004 agreement was an agreement between TCS on the one side and Engico on the other," the court ignored the evidence in the record establishing that Engico was unaware of TCS LLC's alleged role in representing Engico. (Doc. 83, Def.'s SOF, #3805 (¶ 12), 3809 (¶ 31), 3817–18 (¶¶ 83–90); Doc. 84, Def.'s SOF Resp., #4435 (¶ 27).) As Engico explained, before TCS circulated a draft memorandum of understanding in January 2017, Engico did not know that Thompson Jr. owned and operated a company independently from Thompson Sr. or that Thompson Jr.'s company, TCS LLC,

believed it was an additional North American sales representative for Engico. (Doc. 83, Def.'s SOF, #3809 (¶ 31).)

*Second*, in concluding that the parties' "commission structure" was sufficiently definite, the court improperly relied upon two sales, over a 15-year period, to Lawrence Paper in 2005 and Lawrence Paper's affiliate Jayhawk Boxes in 2017, to conclude that the parties originally agreed upon an 8% commission rate and later adopted a sliding scale. (Doc. 95, Order, #4571 [A11].) In finding that the parties achieved a meeting of the minds on the commission structure, the court disregarded all the evidence establishing that commissions were to be determined on a case-by-case basis. Based on the factual record before it, it was erroneous for the court to find that "a reasonable jury could *only* conclude that TCS and Engico agreed at first to an 8% commission, then to sliding scale," and that "[n]o reasonable jury could find the terms of the agreement any different." (*Id.* at #4569 [A9] (emphasis in original).)

*Third*, the court unduly emphasized the territorial and service components of the parties' relationship. (*Id.* at #4571 [A11].) It is true that TCS was involved in providing "solicitation and promotional services" to Engico. (*Id.*) And it is true that those services were provided in "North America." (*Id.*) But consensus on these generalities should not have been sufficient to offset the substantial uncertainties regarding the other terms of the parties' relationship. In addition, the court's conclusion that "[e]veryone agree[d]" to these

36

generalities obscured the lack of consensus regarding exclusivity discussed above. (*Id.*)

*Fourth*, the court improperly determined that the duration of the alleged agreement was sufficiently definite based on *the absence* of a durational term or a termination provision. (*Id.*) "[T]he reason for considering duration or method of termination to be essential terms in a [sales-representative] contract is that courts are reluctant to enforce contracts whose lengths are wholly indefinite." *Floyd Lofchie & Assocs., Inc. v. Alsy Mfg. Co.*, No. 88 C 10780, 1989 WL 152669, at *4 (N.D. Ill. 1989). The alleged 2004 agreement between Engico and TCS was not for a specific length of time and did not provide for a specific method of termination. Yet, instead of determining that these facts militated against summary judgment, the court, without any explanation, concluded that, because the alleged agreement was implicitly terminable at will under Illinois law, this implied durational term placed the existence of the alleged agreement outside of, rather than within, the purview of the jury. (*Id.*) This was erroneous. *See Anderson*, 1996 WL 33410082, at *7 (stating that "an at-will contract" results in "an i*ndefinite* durational term") (emphasis added); *Floyd Lofchie*, 1989 WL 152669, at *4 (concluding that "a *definite* duration term" of one year satisfied the duration requirement) (emphasis added).

*Fifth*, the court improperly minimized the significance of the parties' failure to agree on posttermination commissions. (*Id.*) *See Anderson*, 1996 WL 33410082, at *6 (stating that "commission structure" is an "essential" term of a sales-representative agreement). The absence of an agreement on

posttermination commissions supported submitting the question whether an agreement was formed to the jury. The court implicitly acknowledged as much when it concluded that the jury would have to decide the availability of posttermination commissions based on custom and usage. (*Id.* at #4572–75 [A12–15].) It was logically and legally inconsistent for the court to conclude that, on the one hand, the absence of an agreement on posttermination commissions did not support denying summary judgment, but on the other hand, the posttermination-commission issue would have to be decided by the jury.

In the end, the court entered summary judgment based on an alleged agreement with no definitive commission structure, no consensus as to exclusivity, no clearly defined parties, and no terms addressing duration or termination, just because Engico and TCS had discussed working with one another, and consummated two sales, over a 15-year period. "[T]he omission of crucial terms is powerful evidence that no contract was intended." *Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 655 (7th Cir. 2004). The jury should have been allowed to decide whether a contract was intended in this case.

### 3. The cases on which the district court relied do not support its summary-judgment ruling.

The cases cited in the district court's summary-judgment order do not support the court's conclusion that there was no genuine issue of material fact regarding the existence of a valid, enforceable sales-representative agreement between Engico and TCS. (Doc. 95, Order, #4570–71 [A10–11].) Specifically:

- In *Morey v. Hoffman*, 12 Ill. 2d 125 (1957), the Illinois Supreme Court affirmed a judgment in the counterdefendant's favor on the counterplaintiff's claim to enforce a contract for the sale of land where "numerous terms and conditions necessary to the closing of a sale . . . remained undetermined" at the time the order vacating the sale was entered. *Id.* at 131. The Court's disposition in *Morey*, unlike the district court's ruling in this case, was that the alleged agreement could *not* be enforced.

- In *Midland Hotel*, the Illinois Supreme Court affirmed a judgment in the plaintiff's favor on the plaintiff's breach-of-contract claim where the evidence showed that an enforceable oral contract existed for the defendant to provide the plaintiff with "appropriate listings" in a telephone directory. *Midland Hotel*, 118 Ill. 2d at 312–15. The judgment was the result of a jury trial, not the result of a summary-judgment ruling. *Id.* In addition, unlike the disputed evidence in this case, in *Midland Hotel*, there was ample undisputed evidence demonstrating that the parties had reached an agreement. *Id.*

- In *Cheever*, the Illinois Supreme Court reversed a judgment in the plaintiff's favor on its claim that a written publishing agreement was valid and enforceable where "major unresolved uncertainties" existed regarding essential terms of the alleged agreement. *Cheever*, 144 Ill. 2d at 29–31. The judgment was the result of a full bench trial, not the result of a summary-judgment ruling, and the ultimate disposition, unlike the district court's summary-judgment ruling in this case, was that the alleged agreement could not be enforced. *Id.*

- Similarly, in *Kastalon*, this Court affirmed an order granting summary judgment against the plaintiff, and in favor of the defendants, on the plaintiff's breach-of-contract claim where the alleged oral agreement "was not sufficiently definite as to duration, a material term," and there was no meeting of the minds. *Kastalon*, 880 F.3d at 829–30. The summary-judgment ruling in *Kastalon*, unlike the summary-judgment ruling at issue here, favored the parties seeking to avoid the alleged agreement, not the party seeking to enforce it. *Id.*

- Finally, in *Anderson*, the district court denied the defendant's motion for summary judgment on the plaintiff's

> breach-of-contract claim where there was "a genuine issue of material fact as to whether the parties intended to provide for a definite duration" in their alleged written sales-representative contract. *Anderson*, 1996 WL 33410082, at *7. In contrast to the district court in this case, the district court in *Anderson* left the jury to decide "whether the terms of the [parties'] agreement [were] sufficiently definite to create an enforceable contract." *Id.* at *10.

These cases supported *denying* summary judgment on TCS's breach-of-contract claim, not granting it.

### 4. The district court's summary-judgment ruling fundamentally altered the parties' trial.

As this Court has noted, a plaintiff that "might have been comfortable proceeding somewhat informally in its dealings with [a] defendant . . . cannot later expect the court to complete the negotiation process and arrive at terms on its behalf." *Kastalon*, 880 F.3d at 830 (internal quotation marks omitted). That is precisely what TCS asked the district court to do here, and the district court erroneously obliged by granting summary judgment in favor of TCS regarding the existence of a valid, enforceable oral sales-representative agreement between TCS and Engico.

Had the district court denied summary judgment and allowed Engico to present evidence at trial challenging the existence of an oral agreement, the trial record would have differed materially. *First*, the jury would not have been instructed that an oral agreement existed, that Engico admitted to certain terms of the agreement, or that Engico owed TCS a commission of €180,000 for the Lawrence Paper sale. (Doc. 151, Tr., #5908 (798:9–11), 5910 (800:6–15), 5914–15 (804:25–05:4), 5915 (805:4–6).)

*Second*, Engico would have had the ability to argue to the jury that the relationship between Engico and TCS was an informal one in which TCS would market Engico's products and receive commissions on a case-by-case basis if TCS had an active role in procuring a sale. Doing so would have enabled TCS to demonstrate that no commissions were owed on the 2019 and 2020 sales to Lawrence Paper, President Container, and Welch Packaging through Haire.

The district court erred by granting summary judgment in favor of TCS regarding the existence of a valid, enforceable oral sales-representative agreement between TCS and Engico. This Court should reverse the district court's entry of summary judgment and remand this matter for a new trial.

## II. The district court erred in concluding that there was no genuine issue of material fact regarding the enforceability of the alleged 2018 oral agreement to continue Engico's relationship with TCS until 2021.

The district court also erred in rejecting Engico's statute-of-frauds defense. Engico properly presented the defense in responding to TCS's motion for summary judgment. (Doc. 81, Def.'s MSJ Resp., #3170–71.) In addition, Engico established that, at a minimum, there was a genuine issue of material fact regarding the applicability of the statute of frauds to the parties' alleged 2018 agreement.

### A. Engico did not waive its statute-of-frauds defense.

The district court erred in finding that Engico "may have waived" its statute-of-frauds defense. (Doc. 95, Order, #4575 [A15].) An affirmative defense is not waived solely because a party does not plead the defense in its answer.

41

*See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir. 1987); *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 928 (7th Cir. 1991).

For example, in *DeValk*, this Court held that a defendant did not waive its right to rely on a contractual release as an affirmative defense to the plaintiffs' claims where the defendants did not plead the release as an affirmative defense to the plaintiffs' complaint but did raise the release during summary-judgment briefing. *DeValk*, 811 F.2d at 334. The Court reasoned that, "when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal." *Id.*

The Court explained that the purpose behind Rule 8(c) of the Federal Rule of Civil Procedure, which requires a party to affirmatively state an affirmative defense, is to avoid surprise to the other party. *Id.* The parties in *DeValk* were aware "that the release issue was one of the legal issues to be resolved," even though the plaintiff had not pleaded the release as an affirmative defense. *Id.* Although it would have been "better housekeeping" for the defendants to seek leave to amend their answer, "the rights of plaintiff[s] to a fair trial free from surprise were not violated." *Id.* (internal quotation marks omitted).

Similarly, in *Dresser*, this Court held that the counterdefendant did not waive the right to assert the statute of frauds as an affirmative defense to the counterplaintiff's counterclaim where the counterplaintiff did not plead the statute of frauds as an affirmative defense to the counterclaim but did raise the statute of frauds in the reply in support of its motion for judgment on the

42

pleadings, which the district court treated as a motion for summary judgment. *Dresser*, 936 F.2d at 927–28. Relying on *DeValk*, this Court reiterated that, "'*when parties argue an affirmative defense in the district court, technical failure to plead the defense is not fatal.*'" *Id.* at 928 (quoting *DeValk*, 811 F.2d at 334) (emphasis in original).

As in *DeValk*, the Court in *Dresser* reasoned that the purpose behind Rule 8(c) is to avoid "unfair surprise" and to allow the party against whom an affirmative defense is asserted to have "a full opportunity to respond" to the defense. *Id.* (internal quotation marks omitted). The counterplaintiff in *Dresser* had such an opportunity when it filed an "Additional Memorandum" in opposition to the counterdefendant's motion. *Id.*

This Court's decisions in *DeValk* and *Dresser* are consistent with the decisions of Illinois courts in this area, which have found, under Illinois law, that a statute-of-frauds defense does not need to be pleaded in an answer to preserve the defense for further litigation. *See Hubble v. O'Connor*, 291 Ill. App. 3d 974, 985–86 (1st Dist. 1997) (holding that statute-of-frauds defense was not waived where it was asserted for the first time in the defendants' motion for summary judgment); *Mapes v. Kalva Corp.*, 68 Ill. App. 3d 362, 366 (2d Dist. 1979) (stating that "proper pleading of an affirmative defense such as the statute of frauds is not restricted to an original answer"); *see also Uscian v. Blacconeri*, 35 Ill. App. 3d 80, 84 (1st Dist. 1975) (affirming decision to allow counterdefendants to amend answer to counterclaim to assert statute-of-frauds

43

defense even though leave to amend was requested "after proofs had been closed at trial").

*DeValk, Dresser*, and the Illinois case law cited above support finding that, because Engico's statute-of-frauds defense did not unfairly surprise TCS, Engico did not waive the defense. *First,* although Engico did not plead the statute of frauds in its answer, the answer put TCS on notice that the absence of a written agreement between the parties was squarely at issue in the case. TCS's complaint characterized the parties' initial discussions about their relationship as an "Agreement" the parties later "confirmed" in February 2018. (Doc. 1, Compl., #3.) In reference to those discussions, Engico expressly stated in its affirmative defenses that the alleged agreement "was never formalized in writing regarding a definitive commission rate or duration," the essence of the statute of frauds. (Doc. 42, Ans., #168.)

In addition, in Engico's first affirmative defense, it alleged that it "notified [TCS] that [Engico] was terminating any purported agreement in 2019." (*Id.* at #170.) Engico's "termination" defense was consistent with its subsequently stated position that, because the alleged 2018 agreement to continue Engico's relationship with TCS until 2021 was barred by the statute of frauds, any alleged agreement between Engico and TCS that existed between 2002 and 2018 was terminable at will. (*Compare id. with* Doc. 81, Def.'s MSJ Resp., #3170–71.)

*Second*, Engico raised the statute-of-frauds defense well before trial. Engico filed its response to TCS's motion for summary judgment on December

6, 2021. (Doc. 81, Def.'s MSJ Resp., #3155.) The district court entered its summary-judgment order on April 26, 2022. (Doc. 95, Order, #4561 [A1].) The trial in this matter did not commence until August 22, 2022. (Doc. 147, Tr., #5111.) Based on Engico's response to the motion for summary judgment, TCS was on notice over eight months before trial that Engico intended to argue that the alleged 2018 agreement between Engico and TCS was barred by the statute of frauds. (Doc. 81, Def.'s MSJ Resp., #3170–71.)

*Third*, TCS had a full and fair opportunity to respond to the statute-of-frauds defense. After Engico raised the defense in its response to TCS's motion for summary judgment, TCS filed a reply brief in which it expressly opposed Engico's argument that the defense barred the parties' alleged 2018 agreement. (Doc. 86, Pls.' MSJ Reply, #4461–64.)

These facts are directly analogous to the facts at issue in *Dresser*. In *Dresser*, as in this case, the statute-of-frauds defense was not raised until summary judgment, but because the party opposing the defense had an opportunity to respond to it during summary-judgment briefing, as was the case here, the defense was not waived. *Dresser*, 936 F.2d at 928. Indeed, the facts at issue in this case provide even stronger support for finding that Engico did not waive its statute-of-frauds defense, given the allegations in Engico's affirmative defenses. (Doc. 42, Ans., #168, 170.)

Finally, *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302 (7th Cir. 2010), the case on which the district court relied in finding that Engico may have waived its statute-of-frauds defense, is distinguishable. (Doc.

45

95, Order, #4575 [A15].) In that case, this Court concluded that a preemption defense was waived for purposes of the defendants' appeal from a preliminary injunction where "the defendants did not raise the preemption defense until after they had appealed the preliminary injunction." *Id.* at 309. The Court stated that it was "not appropriate for [it] to overturn an injunction on the basis of a defense that the district court had no opportunity to consider." *Id.*

Ultimately, in *Russian Media*, the Court "expressed no opinion on whether the preemption defense [was] preserved for further proceedings in the district court." *Id.* Rather, it was up to "the district court to decide whether the defendants [had] permanently waived the preemption defense by not raising it until after the preliminary injunction was issued." *Id.*

This case, unlike *Russian Media*, does not involve a situation where the defense in question was not asserted until after the entry of the order at issue. Engico asserted its statute-of-frauds defense during summary-judgment briefing, which occurred before the summary-judgment order was entered and before the trial occurred. (Doc. 81, Def.'s MSJ Resp., #3170–71.) The statute-of-frauds defense could have been fully litigated at trial. The district court erred in concluding that Engico "may have waived" the defense. (Doc. 95, Order, #4575 [A15].)

**B.    The district court erred in concluding that the statute of frauds did not apply to the parties' alleged 2018 agreement.**

The district court further erred in concluding that the statute of frauds did not apply to the parties' alleged 2018 agreement. (Doc. 95, Order, #4575

[A15].) The jury should have been allowed to decide whether the alleged 2018 agreement, whose duration expressly exceeded one year, was capable of being performed within that time.

If the district court had not erroneously rejected Engico's statute-of-frauds defense in granting TCS's motion for summary judgment, Engico would have been allowed to pursue the defense at trial, and the trial record would have differed materially. *First*, the jury would have been instructed that, if the alleged 2018 agreement could not have been performed within a year of the date on which it was made, the alleged agreement was unenforceable. Because of the district court's summary-judgment ruling, there was no basis for Engico to request a statute-of-frauds instruction at trial, and no statute-of-frauds instruction was given. (Doc. 151, Tr., #792:20–25.)

*Second*, Engico would have been able to argue to the jury that, because the alleged 2018 agreement was barred by the statute of frauds, Engico did not owe commissions on the sales to Lawrence Paper, President Container, or Welch Packing through Haire, because there was no enforceable agreement between Engico and TCS during the time period in which those sales were consummated. Thus, even if a valid, enforceable sales-representative agreement existed between Engico and TCS as of 2004, as the district court erroneously concluded, the absence of an agreement to extend that relationship beyond 2018 would have altered TCS's eligibility for the commissions in question.

By concluding that the statute of frauds did not apply to the parties' alleged 2018 agreement, the district court committed reversible error. As a result, in addition to reversing the district court's erroneous ruling that a valid, enforceable sales-representative agreement existed between the parties as of 2004, this Court should separately and independently reverse and vacate the district court's erroneous statute-of-frauds ruling and remand this matter for a new trial at which the jury is instructed regarding the statute of frauds. (Doc. 151, Tr., #792:20–811:5.)

### 1.    At a minimum, Engico established a genuine issue of material fact regarding whether the alleged 2018 agreement was performable within a year.

"The statute of frauds . . . bar[s] actions based upon nothing more than loose verbal statements." *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 489 (1997). The statute is based on "the legislature's sound conclusion that while the technical elements of a contract may exist, certain contracts should not be enforced absent a writing." *Id.* As "an evidentiary safeguard," it "protect[s] . . . not just the parties to a contract, but also . . . the fact finder from . . . the problems of proof accompanying oral contracts." *Id.*

Section 1 of Illinois's Frauds Act "prohibits oral contracts that cannot be performed within one year of their making." *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 371 (1st Dist. 2006); *see* 740 ILCS 80/1. "The period of one year, although arbitrary, recognizes that with the passage of time evidence becomes stale and memories fade." *McInerney*, 176 Ill. 2d at 489. The test for determining whether this provision applies "is whether the contract is capable

of being performed within one year of its formation, not whether such occurrence is likely." *Robinson*, 367 Ill. App. 3d at 370; *Sherwin v. Ault*, 219 Ill. App. 3d 213, 215 (3d Dist. 1991) (same).

In the parties' summary-judgment submissions, they agreed that, "[o]n February 9, 2018, [Thompson Sr.] met with Benzoni in Charlotte, North Carolina," where they agreed that TCS would serve as Engico's "exclusive sales representative in North America until [Thompson Sr.] retired at the end of 2021," with Engico denying that this was a "legally binding agreement." (Doc. 84, Def.'s SOF Resp., #4444–45 (¶ 63).) The alleged 2018 agreement between Engico and TCS was definite as to its length: it was for a period of over three years, from February 2018 until December 31, 2021. At a minimum, whether this alleged agreement was capable of being performed within one year of its formation was a question of fact that should have been submitted to the jury. *See Robinson*, 367 Ill. App. 3d at 370; *Sherwin*, 219 Ill. App. 3d at 215.

This Court's decision in *Hammond Group. Ltd., v. Spalding & Evenflo Cos.*, 69 F.3d 845 (7th Cir. 1995), is instructive. In *Hammond*, the Court held that an alleged oral sales-representative agreement contemplating performance for over one year was barred by the statute of frauds. *Id.* at 849. In that case, the plaintiff alleged that, "in October 1984[,] the parties entered into an oral agreement specifying performance for the 1985 calendar year, and years beyond provided subsequent conditions were met." *Id.* The district court directed a verdict in the defendant's favor based on the statute of frauds. *Id.* at 847, 849. This Court affirmed, holding that the alleged agreement "could not be

completed within one year of its creation" and was "therefore barred by the Illinois Statute of Frauds." *Id.* at 849.

Here, as in *Hammond*, performance as a sales representative from February 2018 until "the end of 2021" (Doc. 84, Def.'s SOF Resp., #4444–45 (¶ 63)) could not have been completed within one year of February 2018. At a minimum, this was an issue for the jury to decide. *See id; see also R.J.N. Corp. v. Connelly Food Prods., Inc.*, 175 Ill. App. 3d 655, 663 (1st Dist. 1988) (holding that alleged oral distribution agreement, which was "to remain in effect as long as [the defendant] served customers 'acquainted' with [the plaintiff]," was not performable within a year and was therefore barred by the statute of frauds).

The district court erroneously concluded that the alleged 2018 agreement could have been performed within a year because it was terminable at will. (Doc. 95, Order, #4575 [A15].) In Illinois, a contract is terminable at will when it has no fixed term. *Jespersen v. Minn. Mining & Mfg. Co.*, 183 Ill. 2d 290, 293 (1988); *Indus. Representatives, Inc. v. CP Clare Corp.*, 74 F.3d 128, (7th Cir. 1996).

Courts regularly hold that agreements with fixed terms exceeding one year are barred by the statute of frauds. *See, e.g., Sherwin*, 219 Ill. App. 3d at 216–17 (statute of frauds barred enforcement of alleged oral agreement to continue previous written contract for fixed term where agreement was entered into in October 1987, and performance was to occur through December 1988); *Kiosk Promotions, Inc. v. Tex. Wiz, LLC*, No. 1:19–CV–01847, 2021 WL 4498907, at *3 (N.D. Ill. Mar. 30, 2021) (statute of frauds barred enforcement of alleged

oral agreement to perform "throughout [a] five-year term"); *Sangston v. Ridge Country Club*, No. 93 C 0628, 1993 WL 356927, at *2 (N.D. Ill. Sept. 13, 1993) (statute of frauds barred enforcement of alleged oral agreement "for two years' employment"); *Lessman v. Universal Spray Applications, Inc.*, 690 F. Supp. 679, 680–82 (N.D. Ill. 1988) (statute of frauds barred enforcement of alleged oral agreement to employ plaintiff "for two years").

Here, the alleged 2018 agreement *did* have a fixed term. (Doc. 84, Def.'s SOF Resp., #4444–45 (¶ 63).) Because it had a fixed term, it was subject to the statute of frauds, and because it was not in writing, it was not enforceable.

### 2. The complete-performance exception to the statute of frauds does not apply.

The district court erred in finding that full performance placed the alleged 2018 agreement outside the statute of frauds. (Doc. 95, Order, #4575 [A15].) The complete-performance exception to the statute of frauds does not apply because it is undisputed that TCS did not serve as Engico's sales representative through 2021.

Under the complete-performance exception, "a party who has fully performed an oral contract [that falls] within the one-year provision [of the statute of frauds] may nonetheless have the contract enforced." *McInerney*, 176 Ill. 2d at 491. "When one party fully performs [its] part of [an] alleged oral contract . . ., the courts recognize that this very performance strongly indicates the existence of a contract," thereby "minimiz[ing] the dangers that the Statute

of Frauds [was] designed to prevent." *Anderson v. Kohler*, 397 Ill. App. 3d 773, 785 (2d Dist. 2009) (internal quotation marks omitted).

Here, TCS did not fully perform the alleged 2018 oral agreement to continue the parties' relationship. The alleged agreement extended through 2021. (Doc. 84, Def.'s SOF Resp., #4444–45 (¶ 63).) Engico terminated its relationship with TCS in 2019, with TCS continuing to act as Engico's sales representative through, at most, "the end of 2019." (*Id.* at #4450–51 (¶¶ 91–93); Doc. 83, Def.'s SOF, #3811–12 (¶¶ 48–50).) Because TCS did not serve as Engico's sales representative through 2021, TCS did not fully perform its obligations under the alleged agreement. *See, e.g., Berkowitz v. Urso*, 2014 IL App (1st) 121662, ¶ 44 (complete-performance exception to statute of frauds did not apply where evidence submitted at bench trial did not establish that party seeking to enforce alleged oral agreement "fully performed" under the agreement); *Anderson*, 397 Ill. App. 3d at 786 (same).

### 3. The partial-performance exception to the statute of frauds does not apply.

Finally, the district court erred in finding that partial performance of the alleged 2018 agreement placed it outside the statute of frauds. (Doc. 95, Order, #4575 [A15].) As a matter of law, the partial-performance exception to the statute of frauds does not apply to actions for damages, such as this case.

Relief under the partial-performance exception is only "appropriate where the terms of the contract are clear, definite, and unequivocal, . . . the contract has been at least partially performed by the party seeking the remedy . . . and . . . the acts allegedly done in performance are positively attributable

exclusively to the contract." *Anderson*, 397 Ill. App. 3d at 786 (internal quotation marks and citations omitted). In contrast to the complete-performance exception, the partial-performance exception is "equitable" in nature, so "the only contractual relief it affords is specific performance." *Id.*

A corollary of this rule is that the partial-performance exception "is not applicable in actions at law for monetary damages." *Cain v. Cross*, 293 Ill. App. 3d 255, 259 (5th Dist. 1997). Thus, where a plaintiff seeks monetary damages, the plaintiff is precluded from relying upon the partial-performance exception to the statute of frauds. *Id.* (partial-performance exception did not apply where plaintiff sought monetary damages); *Vuagniaux v. Korte*, 273 Ill. App. 3d 305, 312 (5th Dist. 1995) (same); *Dickens v. Quincy Coll. Corp.*, 245 Ill. App. 3d 1055, 1062 (4th Dist. 1993) (same); *Bensdorf & Johnson, Inc. v. Telecom Ltd.*, 58 F. Supp. 2d 874, 879 (N.D. Ill. 1999) (same).

Here, TCS sought to recover monetary damages from Engico in connection with Engico's alleged breaches of contract. (Doc. 1, Compl., #5.) Therefore, as a matter of law, the partial-performance exception to the statute of frauds did not apply, and the district court erred in concluding that it did.

## **CONCLUSION**

**FOR THESE REASONS**, either independently or in combination, Engico respectfully requests that this Court:

    (a)    reverse the district court's ruling on summary judgment that a valid, enforceable oral agreement existed between the parties as of 2004;

(b)     reverse the district court's ruling on summary judgment that Engico waived its statute-of-frauds defense;

(c)     reverse the district court's ruling on summary judgment that the statute of frauds did not apply to the parties' alleged 2018 agreement to continue their relationship until 2021;

(d)     vacate the judgment entered by the district court;

(e)     remand the matter for a new trial consistent with this Court's opinion; and

(f)     grant any other relief in Engico's favor that the Court deems just.

Dated: April 24, 2023

<div style="margin-left:40%">

Respectfully submitted,

By:   _/s/ Seth A. Horvath_

Charles R. Bernardini
Kevin P. Shea
Seth A. Horvath
Margaret E. Borse
**Nixon Peabdody LLP**
70 W. Madison St., Suite 5200
Chicago, Illinois 60602
Telephone: (312) 977-4400
Facsimile: (312) 977-4405
cbernardini@nixonpeabody.com
kpshea@nixonpeabody.com
sahorvath@nixonpeabody.com
mborse@nixonpeabody.com

*Attorneys for Appellant Engico S.r.l.*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Seth A. Horvath, an attorney, certify as follows:

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32(c) because it contains 13,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it was prepared using the Microsoft Office 365 version of Microsoft Word, in Bookman Old Style proportionally spaced typeface, with 12-point font for the text and 11-point font for the footnotes.

<div style="text-align: right">

_/s/ Seth A. Horvath_
_One of the Attorneys for Appellant Engico_
_S.r.l._

</div>

Dated: April 24, 2023

## CIRCUIT RULE 30(d) STATEMENT

In accordance with Circuit Rule 30(d), I, Seth A. Horvath, an attorney, certify that the **Required Short Appendix** to this brief contains all the documents required by Circuit Rule 30(a) and that, to the extent those documents fall within the requirements of Circuit Rule 30(b), they are properly included in accordance with Circuit Rule 30(b)(7) because, when added to the required appendix, they do not exceed 50 pages.

_/s/ Seth A. Horvath_
_One of the Attorneys for Appellant Engico_
_S.r.l._

Dated: April 24, 2023

## CERTIFICATE OF SERVICE

I, Seth A. Horvath, an attorney, certify that on April 24, 2023, I caused the accompanying **Brief and Short Appendix of Appellant Engico S.r.l.** to be served on:

William R. Klein
Adam J. Glazer
Richard M. Goldwasser
**Schoenberg Finkel Beederman Bell Glazer LLC**
300 S. Wacker Dr., Suite 1500
Chicago, Illinois 60606
Telephone: (312) 648-2300
bill.klein@sfbbg.com
adam.glazer@sfbbg.com
richard.goldwasser@sfbbg.com

by (1) causing a true and correct copy of the same to be transmitted to the counsel listed above using the United States Court of Appeals for the Seventh Circuit's CM/ECF system in accordance with Federal Rule of Appellate Procedure 25 and Circuit Rule 25 and (2) causing two true and correct copies of the same to be transmitted to the counsel listed above by depositing them in the United States mail in accordance with Federal Rules of Appellate Procedure 25 and 31(b).

_/s/ Seth A. Horvath_
*One of the Attorneys for Appellant Engico S.r.l.*

Dated: April 24, 2023

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

District-Court Memorandum and Order Dated April 26, 2022 ...................... A 1

District-Court Memorandum and Order Dated July 22, 2022 .................... A 18

District-Court Memorandum and Order Dated January 17, 2023 .............. A 25

District-Court Judgment Dated January 17, 2023..................................... A 48

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THOMPSON CORRUGATED SYSTEMS, INC. and
THOMPSON CORRUGATED SYSTEMS LLC,

        Plaintiffs,

    v.

ENGICO S.R.L.,

        Defendant.

Case No. 20-cv-122-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on cross motions for summary judgment filed by defendant Engico S.r.l. (Doc. 71) and by plaintiffs Thompson Corrugated Systems, Inc. ("Thompson Inc.") and Thompson Corrugated Systems LLC ("Thompson LLC") (collectively, "TCS") (Doc. 77). The parties have responded and replied to the respective motions.

This case arises out of a relationship between Engico and the plaintiffs that began in 2002 and went south in 2019. The plaintiffs allege that in 2004 Engico agreed in an oral agreement that Thompson Inc. and the predecessor to Thompson LLC would jointly be the exclusive sales representative for Engico's products—machinery to produce corrugated materials—in North America, and that they would be paid on commission. The relationship was terminated in 2019, and the current dispute is about whether Engico failed to pay the plaintiffs commissions on sales made around the time the relationship soured. It is indisputable that Engico owes at least one commission to TCS, and there is a genuine issue of material fact as to the two others in issue.

## I.    Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-

2

**A2**

minded jury could return a verdict for the [nonmoving party] on the evidence presented."

*Anderson,* 477 U.S. at 252.

## II.    Facts

The main dispute in this case is whether there was an enforceable sales representative

agreement between Engico and TCS and, if so, what the terms of that agreement were.  In their

cross-motions for summary judgment, the parties agree on a number of facts but disagree on the

legal implications of those facts.  The Court notes their disagreements as it sets forth the

following relevant facts.

Engico is an Italian company that manufactures machinery to produce corrugated

materials such as cardboard boxes.  In 2002, having never sold its machines in North America

and having no North American sales representative, Rinaldo Benzoni, Engico's founder and

managing director, began discussions with Fred Thompson Sr. ("Thompson Sr."), Thompson

Inc.'s president, about TCS's becoming Engico's North America sales representative.

Thompson's son, Fred Thompson II ("Thompson II") was the owner of Thompson LLC (and its

predecessor corporation).

Over the following years, the parties exchanged written proposals for an exclusive

manufacturer's representative agreement, but they never signed a written agreement.  Although

there was no written agreement, in 2004 the parties entered into an oral agreement that TCS

would be Engico's exclusive North American sales representative and that Engico would pay it a

commission for the sales.  TCS contends the commission upon which they agreed was 8% after

transportation and installation costs.  Benzoni contends there was no agreement reached on a

specific commission rate, but that Engico was still exploring the North American market and that

any commissions would depend on the circumstances of the individual sale and would be

determined at the time the sale price was being negotiated with the prospective customer.

There is no dispute that the oral agreement did not expressly address the question of termination or specific residual commissions after termination of the arrangement. Benzoni testified that, as a practical matter, TCS was Engico's only sales representative in the United States, although that was because Engico never engaged another representative until 2019, not because they agreed to exclusivity. Thompson Sr. testified that the agreement included the Manufacturers' Agents National Association ("MANA") Code of Ethic, but Benzoni testified that, although he received a copy of the document, he never read it or agreed to it.

Subsequently, TCS promoted Engico's machinery and procured a sale of an Engico machine to Lawrence Paper Company in October 2005. After the sale, TCS sent Engico an invoice for an 8% commission, which Engico paid without objection.

In February 2011, Engico informed TCS that because of the economic downturn, it needed to change the commission rate to a sliding scale going forward. In 2012, the parties discussed a commission structure where TCS would be paid 6% for the first million euros of the sales price, 5% for the next million, 4% for the next million, and 3% for anything exceeding three million euros. Thompson Sr. recalls that this sliding scale was agreed upon for the next three sales. Benzoni testified that was the agreement but also that the commission would be determined on a case by case basis. Again, Benzoni does not believe there was a firm commitment to this particular sliding scale, but TCS contends that Engico agreed to start with this commission structure and see how it worked.

In October 2016, since TCS had not procured a sale since 2005, Engico told TCS that the relationship would terminate. Nevertheless, the parties continued discussions and in January 2017 again tried to formalize the relationship in a written agreement. Again, they were

unsuccessful, and no written agreement was formed.

On December 22, 2017, Engico sold a machine to Jayhawk Boxes, Inc., an affiliate of Lawrence Paper, the 2005 purchaser of an Engico machine. Engico paid TCS a commission consistent with the sliding scale the parties had discussed in 2012.

In early 2018, Benzoni and TCS agreed to maintain the sales representative relationship until Thompson Sr. retired, which he planned to do at the end of 2021. Nevertheless, Thompson Sr.'s failing health and Benzoni's concerns that Thompson II would not be an acceptable partner in the relationship caused Engico to reconsider that timeline.

In 2019, Lawrence Paper contacted Engico directly to purchase another machine. Even though TCS had brought Lawrence Paper to Engico as a customer in 2005 and developed it as a client since then, at Engico's request, TCS did not work on the specific transaction in 2019. Engico sold the machine to Lawrence Paper on May 10, 2019, and informed TCS of the terms of the sale, but did not pay TCS a commission at the time. Had the sliding scale discussed in 2012 been in place, the commission would have been € 180,000.

In the summer of 2019, Engico again informed TCS that it intended to terminate the relationship as of January 1, 2020. At Engico's request, TCS gave Engico a list of potential customers for Engico's machinery along with its estimate of the likelihood of completing each sale. Benzoni testified that he was willing to pay commissions on those sales if they happened before January 1, 2020. One of those potential customers was Welch Packaging, which was interested in buying the used machine Lawrence Paper had originally purchased in 2005.

At a subsequent meeting on August 7, 2019, Benzoni informed Thompson Sr. that Engico was terminating the relationship and engaging the Haire Group as its United States representative. Benzoni gave TCS the opportunity to work with the Haire Group for the rest of

**A5**

the year to ensure a smooth transition.  Benzoni states that Engico offered TCS a commission on the May 2019 sale to Lawrence Paper to be paid once Lawrence Paper started paying Engico, but TCS refused to accept the commission.  Benzoni testified that the commission Engico offered comported with the sliding scale discussed in 2012:  6% for the first million euros, 5% for the next million, 4% for the next million, and 3% for anything beyond that.  On the other side, Thompson Sr. claims Benzoni said no commission would be paid because TCS was not involved in the sale.  Thompson Sr. left the meeting, and no further commissions were discussed.  A subsequent letter to Thompson Sr. offered a reduced commission.

In a letter dated September 10, 2019, Engico advised TCS that their relationship would terminate on December 31, 2019, and that until that time, Haire would also serve as Engico's North American sales representative.  The letter also offered a reduced commission on the Lawrence Paper sale and any other sales concluded before December 31, 2019.

The following month, on October 30, 2019, Engico sold a machine to President Container Group; TCS played no role in developing that client or in directly procuring that sale.  Early in January 2020, Engico sold a used machine to Haire, which had arranged three days earlier to sell it to Welch Packaging.  The used machine was shipped directly from Lawrence Paper to Welch Packaging.  Welch Packaging was one of the potential customers TCS had identified in the summer of 2019; President Container was not.  Had the sliding commission scale discussed in 2012 been observed, the commissions for the President Container and Haire/Welch Packaging sales would have been € 192,000 and € 70,000, respectively.

TCS filed this lawsuit on January 30, 2020, to recover commissions they believed Engico owes them.  Count I is a claim for breach of contract; Count II is for violation of the Illinois Sales Representative Act ("IRSA"), 820 ILCS 120/0.01 *et seq.*; Count III is for an accounting;

and Count IV, pled in the alternative, is a claim for unjust enrichment.  Engico denies that there

was ever an enforceable contract for which commissions would be due.

**III.    Analysis**

Because the Court is hearing this case under its diversity jurisdiction, *see* 28 U.S.C.

§ 1332(a), whether there was an enforceable contract and what the terms of any such contract

were are governed by state substantive law.  *Windy City Metal Fabricators & Supply, Inc. v. CIT

Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S.

64 (1938)).  All parties cite to Illinois substantive contract law, so the Court assumes that law

applies.  The Court therefore applies relevant decisions of the Illinois Supreme Court, and if it

has not spoken on the issue, the Court predicts how it would rule using decisions from the

Illinois Appellate Courts as guidance.  *Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359,

369 (7th Cir. 2018).

    A.    Enforceability of Oral Contract

One fundamental principle of Illinois law that appears to escape Engico is that, generally,

an oral contract is just as enforceable as a written contract as long as there is an offer and

acceptance and a meeting of the minds about the terms of the agreement.  *Quinlan v. Stouffe*, 823

N.E.2d 597, 603 (Ill. App. Ct. 2005) (citing *Lampe v. O'Toole,* 685 N.E.2d 423, 424 (Ill. App.

Ct. 1997)).  Thus, unless the law requires a writing, the failure of parties to execute a written

instrument memorializing their agreement will not prevent enforcement of the agreement if it is

otherwise a valid contract.  It is true that the lack of a writing makes the terms more difficult to

prove, but it will not, by itself, render the agreement unenforceable.

    B.    Meeting of the Minds

The parties first dispute whether there was an agreement, that is to say, a meeting of the

minds about what the terms of an agreement were.  As noted above, an enforceable contract requires a meeting of the minds, that is, mutual assent to the terms of the contract.  *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987).  However, "it is not necessary that the parties share the same subjective understanding as to the terms of the contract."  *Id.* (citing 1 S. Williston, Contracts §§ 21 & 22 (3d ed. 1957)).  It is enough if their objective conduct indicates an agreement to the terms.  *Midland Hotel*, 515 N.E.2d at 65.  "Otherwise, a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates.  As such, [a party's] subjective understanding of the terms of the contract is immaterial."  *Id.*  A clash of subjective understandings is not sufficient to create an issue of fact for the jury because "the focus under Illinois law is on the *conduct* of the parties and whether that conduct objectively manifested assent to an agreement."  *Baker v. Elmwood Distrib., Inc.*, 940 F.2d 1013, 1017 (7th Cir. 1991) (citing *Midland Hotel*, 515 N.E.2d at 65; 12 Illinois Law and Practice *Contracts* § 9 (West 1983); Restatement (Second) of Contracts § 19 (1981)).

While Engico admits that in 2004 there was an oral agreement that TCS would be its exclusive North American sales representative in exchange for sales commissions, it points to the parties' varying testimony over the amount of the sales commissions.  Engico says they agreed to provide a commission, although the amount was not determined and remained at Engico's discretion depending on the circumstances of the sale.  On the other side, TCS says they agreed to 8% and later agreed to change to a sliding scale.

The parties' conduct evidences an agreement over which the minds met.  TCS promoted Engico's machines and procured a sale to Lawrence Paper in 2005, and Engico paid TCS an 8% commission for that sale without further negotiation or discussion.  Additionally, the parties

agreed to a change in 2012 to a sliding scale; a "change" would not have been necessary had

there not been a set rate already established.  And then, again without further negotiation or

discussion, Engico paid TCS a commission for the 2017 Jayhawk Boxes sale based on the sliding

scale discussed in 2012 and, according to Benzoni, offered the sliding scale commission on the

2019 Lawrence Paper sale.  A reasonable jury could look at this conduct and conclude that there

was a meeting of the minds in 2004 that Engico would pay TCS a commission of 8% and again

in 2012 that the commission would be based on a sliding scale for at least the next three sales.

Engico is not entitled to summary judgment on the theory that there was no meeting of the minds

with TCS.

Indeed, the evidence is such that a reasonable jury could *only* conclude that TCS and

Engico agreed at first to an 8% commission, then to a sliding scale.  Their subjective difference

of opinion notwithstanding, that is how they objectively behaved, and Illinois law says their

behavior is what counts.  No reasonable jury could find the terms of the agreement any different.

Therefore, TCS is entitled to summary judgment on the question of whether there was a meeting

of the minds about the percentage of commission governing the relationship.

C.    Definite and Certain Terms

Engico further argues that any agreement it had with TCS is too indefinite and uncertain

to be enforced because it did not contain specific essential terms usually found in sales

representative agreements:  which plaintiff was owed a commission, the duration of the

agreement, termination provisions, post-termination residual commissions, and the commission

rate.

TCS, on the other hand, contends that the agreement's terms were definite and certain

enough because the agreement incorporated the customs and practices of the manufacturers'

9

**A9**

representative industry.  Specifically, TCS claims that it is the industry custom and practice for a manufacturer's exclusive sales representative to receive a commission on a sale anywhere with the representative's territory during the period of the representation even if the representative played no role in soliciting or procuring the sale.  It also claims that it is customary in the industry for a manufacturer's exclusive sales representative to receive a commission, even after termination of the representative arrangement, on sales solicited by the representative before the termination but not completed until after the termination.  Because of these industry customs and practices, TCS claims Engico owes it commissions on the 2019 sales to Lawrence Paper and President Container and on the January 2020 sale to Haire which ended up selling the machine to Welch Packaging.

It is true that a contract's terms must be definite and certain enough for a court to enforce them.  *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987).  Terms are "sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do."  *Morey v. Hoffman*, 145 N.E.2d 644, 647-48 (Ill. 1957); *accord Midland Hotel*, 515 N.E.2d at 65.  However, the contract need not "provide for every collateral matter or every possible future contingency which might arise in regard to the transaction."  *Morey*, 145 N.E.2d at 647-48.  Parties may leave some terms out or agree to decide them later, but they must include essential terms certain enough to provide a basis to decide whether the agreement has been kept or breached.  *See, e.g., Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991) (book publishing contract lacked essential terms where no provisions regarding length and content of book; date of manuscript delivery; criteria for form and content; date, style, manner, and duration of publication; and book price); *Toll Processing*

**A10**

*Servs., LLC v. Kastalon Polyurethane Prods.*, 880 F.3d 820, 829 (7th Cir. 2018) (storage agreement lacked essential terms because did not specify duration).

Specifically with reference to a sales representative's contract, essential terms include "the commission structure, the territory, the services to be performed, the duration of the agreement and/or a termination provision." *Anderson v. Fel-Pro Chem. Prod. L.P.*, No. 95 C 4604, 1996 WL 33410082, at *6 (N.D. Ill. Dec. 19, 1996) (citing *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.,* 365 N.E.2d 316, 318 (Ill. App. Ct. 1977)).  The type of services due is another essential term but it may be inferred from a contract between sophisticated and experienced businesses.  *Anderson*, 1996 WL 33410082, at *6.

While the oral agreement in this case leaves some terms undecided, the essential terms are sufficient for the Court to determine whether the parties have complied with the contract.  It is clear that the 2004 agreement was an agreement between TCS on the one side and Engico on the other, so the identity of the parties is determinable.  As for the definiteness of the commission structure, the Court has already found the parties originally agreed to—and paid—an 8% commission and later modified that agreement to a sliding scale before the agreement was terminated.  Everyone agrees the territory was North America and TCS was to provide solicitation and promotional services in good faith in furtherance of selling Engico's machines. Commissions would be paid, at a minimum, for sales in which TCS was involved in some way The parties did not agree on a duration of the arrangement, but under Illinois law, a contract without a specific duration is terminable at will by either party.  *Jespersen v. 3M*, 700 N.E.2d 1014, 1016 (Ill. 1998).  And while it would have been nice for the parties to have expressly discussed post-termination commissions, that would not be an essential term to have expressly included in the contract, especially where there is a custom or practice regarding residual

11

**A11**

commissions after termination in the sales representative business that may or may not have been implied in the agreement.  In sum, the oral contract at issue in this case has sufficient terms for the Court to enforce it.

And TCS is entitled to have it enforced at least with respect to the 2019 sale of a new machine to Lawrence Paper.  Under the agreement, while TCS was the exclusive sales representative of Engico—that is, up until August 2019 when Engico informed TCS that Haire was coming in—at a minimum Engico was obligated to pay it commissions for sales to customers, like Lawrence Paper, that TCS originally introduced to Engico and worked to develop as a client.  From 2012 on, that commission was determined on a sliding scale.  Consequently, when Engico concluded the May 2019 sale to Lawrence Paper, a customer TCS had brought to Engico, Engico owed a sliding scale commission to TCS.  TCS is entitled to summary judgment to that extent on Count I.

Any commissions based on the 2019 sale to President Container and the 2020 sale to Welch Packaging, if due, would be based on commission terms that may or may not be implied in the contract by custom and usage, as discussed below.

E.     Custom and Usage

Engico argues that in the absence of contract provisions promising TCS commissions for all sales in its sales territory—even ones in which TCS was not involved—or an arrangement for payment of post-termination commissions, contract terms on those matters cannot be implied from trade custom and usage.  On the other side, TCS asserts that essentially every industry norm should be incorporated into the contract, even ones about which Engico had no reason to know or had expressly rejected.  Neither party is completely correct.

Under Illinois law, when construing a contract, the Court must give effect to the intent of

the parties. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007); *Va. Surety Co. v. N. Ins. Co. of New York*, 866 N.E.2d 149, 153 (Ill. 2007). The Court must first attempt to determine this intent solely from the plain and ordinary meaning of the contract language, which is usually the best indication of the parties' intent. *Gallagher*, 874 N.E.2d at 58; *Va. Surety*, 866 N.E.2d at 153. If the parties' intent cannot be discerned from the words of the contract, the Court may consult extrinsic or parol evidence to explain uncertain or ambiguous terms. *Gallagher*, 874 N.E.2d at 58; *Nielsen v. USAA*, 612 N.E.2d 526, 530 (Ill. App. Ct. 1993). This can include "well known, uniform, long-established and generally acquiesced" custom[1] and usage[2] in the particular industry. *Gray v. Mundelein Coll.*, 695 N.E.2d 1379, 1386 (Ill. App. Ct. 1998). "Proof of custom or usage is intended as an aid to the interpretation of the intent of the parties at the time the contract was made." *Chi. Bridge & Iron Co. v. Reliance Ins. Co.,* 264 N.E.2d 134, 139 (Ill. 1970). "If a usage exists in a particular trade of which both parties either had notice or should have had notice, it is only just and proper that their contract should be interpreted in view of the trade practice." *Id.*

Contrary to Engico's assertions, custom and usage may be also used for more than interpreting the meaning of a contract's express words. It can also be used as a "gap-filler" to supplement terms in a commercial contract in a particular setting where the specific contract is silent on a particular issue. *See Fifteenth Ave. Christian Church v. Moline Heat*, 265 N.E.2d 405, 408 (Ill. App. Ct. 1970) ("Where no stipulation to the contrary is included in the contract,

---

[1] Illinois law states, "A 'custom' is universally defined as a long-established practice, considered as unwritten law, and resting for authority on long consent." *Creitz v. Bennett*, 182 N.E. 736, 738 (Ill. 1932); *see* 15 Ill. Law and Prac., Customs and Usages § 1.
[2] Illinois law states, "Usage is a method of dealing, adopted in a particular place or by those engaged in a particular vocation or trade, which acquires legal force, because people make contracts with reference to it." *Currie v. Syndicate Des Cultivators*, 104 Ill. App. 165, 169, 1902 WL 2155, at *2 (Ill. App. Ct. 1902).

**A13**

the customs and usages of the trade are presumed to form a part of the contract, provided the same are known to the parties or provided the parties are chargeable with knowledge thereof."); *Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co. of Am.*, 722 F. Supp. 485, 495 (N.D. Ill. 1989); 12 Williston on Contracts, The definition and effect of usage, § 34:1 (4th ed.).  In this way, "trade usages and customs can be incorporated into a contract in order to remedy a deficiency in the agreement when the agreement obviously omits an essential provision."  12 Williston on Contracts, The incorporation of usage into a contract, § 34:3 (4th ed.).

In this case, the question of whether a custom or usage exists and whether the parties adopted such usage or custom in the contract is generally a jury question unless the facts and circumstances establishing the usage or custom are undisputed and can lead to only one conclusion.  12 Williston on Contracts, The province of the court and the jury § 34:19 (4th ed.).

So Engico is wrong that, as a matter of law, custom and usage cannot supplement an oral contract with terms not addressed in the contract.  On the contrary, whether custom and usage supplement express commission payment terms in an exclusive sales representative agreement would be up to the jury.  TCS offers the testimony of Scott Lindberg, the expert it has tendered in the manufacturers' sales representative industry, about the custom and usage with respect to commissions in exclusive sales representatives' agreements.  Engico argues that Lindberg's expertise is not within the corrugated box industry, so he cannot provide expert testimony.  It also offers its expert, Lance Head, who offers contradictory testimony specifically about the usage and custom for corrugated box sales representatives.  Whether to believe Lindberg or Head with respect to custom and usage is a question to be decided by a jury.

In sum, there was an enforceable agreement between TCS and Engico for commissions in a set amount which may or may not have also included the terms TCS claims were implied by

the custom and usage of the exclusive sales manufacturers' industry.  If such terms were impliedly part of the agreement, it would be up to a jury whether the 2019 sale to President Container and the 2020 sale to Welch Packaging via Haire qualified for commissions under those implied terms.  If those terms were not part of the agreement as custom and usage, then there may be no further commissions due at all.  And until a jury decides whether commissions are due for those two sales, it cannot be determined as a matter of law whether Engico violated the Illinois Sales Representative Act, 820 ILCS 120/0.01 *et seq.*, by failing to pay those commissions in a timely manner.[3]

       F.     <u>Illinois Sales Representative Act</u>

TCS asks for summary judgment on its claim under the IRSA, 820 ILCS 120/0.01 *et seq.* The IRSA provides that where a sales representative's contract does not specify the time a business must pay a commission to the representative, the past practice between the parties will control.  820 ILCS 120/1(2)(B).  Commissions due at the time a sales representative contract is terminated must be paid within thirteen days of the termination or, if commissions become due later, within thirteen days after they become due.  820 ILCS 120/2.  A business that fails to comply with the thirteen-day rule is liable for three times the amount of the commission due, plus attorney's fees and court costs.  820 ILCS 120/3.

Because the Court has granted summary judgment for TCS on Count I to the extent it

---

[3] Engico raises for the first time in its response to TCS's summary judgment motion that any contract entered into in 2018 to last until 2021 is unenforceable under the Illinois statute of frauds, the Frauds Act, 740 ILCS 80/1, since it could not be performed within a year.  Engico may have waived or forfeited this affirmative by not pleading it in its answer.  *See Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010); Fed. R. Civ. P. 8(c)(1).  Engico raised this argument at the eleventh hour in a response brief to which TCS did not have an adequate opportunity to respond in a five-page reply brief.  Additionally, in light of the fact that the contract was terminable at will, as discussed above, it could have been performed within a year and was, in fact, at least partially, if not fully, performed.

**A15**

relies on the 2019 Lawrence Paper sale, TCS is also entitled to summary judgment on Count II

with respect to that sale.  The remainder of Count II cannot be resolved until the jury determines

the terms of the contract.

      G.    <u>Unjust Enrichment</u>

      In light of the Court's finding that an enforceable agreement existed, albeit with some of

the terms yet to be decided, TCS cannot prevail on its unjust enrichment claim in Count IV—

also called *quantum meruit* or contract implied-in-law.  A plaintiff cannot recover under this

theory if there is an actual contract, *see Schroeder v. Sullivan*, 104 N.E.3d 460, 472 (Ill. App. Ct.

2018) (citing *Archon Constr. Co. v. U.S. Shelter, LLC*, 78 N.E.3d 1067, 1074 (Ill. App. Ct.

2017)), and in this case, there was an enforceable oral contract, possibly supplemented with

custom and usage provisions.  Therefore, Engico is entitled to summary judgment on Count IV.

## IV.    Conclusion

      For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** Engico's motion for summary judgment (Doc. 71).  The motion is **GRANTED** to the extent it seeks summary judgment on Count IV, a claim for unjust enrichment or *quantum meruit*.  The motion is **DENIED** in all other respects;

- **GRANTS in part** and **DENIES in part** TCS's motion for summary judgment (Doc. 77).  The motion is **GRANTED** as to Count I and II to the extent they rely on commissions due from the 2019 sale to Lawrence Paper.  The specific amount of the judgment will be determined after further input by the parties.  The motion is **DENIED** in all other respects; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

      The claims remaining for trial, which is currently scheduled for June 13, 2022, are

Counts I and II (to the extent they rely on commissions due from the 2019 sale to President

Container and the 2020 sale to Haire/Welch Packaging), and Count III for an accounting.  The

Court further **ORDERS** a telephone status conference to be held May 4, 2022, at 9:00 a.m. CDT.

The parties should call in to 618-439-7733 for the call.

**IT IS SO ORDERED.**
**DATED:  April 26, 2022**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

17

**A17**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THOMPSON CORRUGATED SYSTEMS, INC. and
THOMPSON CORRUGATED SYSTEMS LLC,

        Plaintiffs,

   v.

ENGICO S.R.L.,

        Defendant.

Case No. 20-cv-122-JPG

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion of plaintiffs Thompson Corrugated Systems, Inc. and Thompson Corrugated Systems LLC (collectively, "TCS") for a determination of the exact amount awardable for their summary judgment victory on Count I (breach of contract) and Count II (Illinois Sales Representative Act) based on the 2019 sale of an Engico machine to Lawrence Paper Company (Doc. 97). TCS seeks entry of an immediate judgment as to the amount determined to be due. Engico has responded to the motion (Doc. 99), and TCS has replied to that response (Doc. 101).

I.     **Background**

A brief recap of the history of this case is helpful to understanding the plaintiffs' request. This case arose out of a relationship between Engico and TCS that began in 2002 and went south in 2019. TCS alleges that in 2004 Engico orally agreed that TCS would jointly be the exclusive sales representative for Engico's products—machinery to produce corrugated materials—in North America, and that it would be paid on commission. The relationship was terminated in 2019.

In granting TCS partial summary judgment, the Court found there was no genuine issue

**A18**

of material fact that, for at least a period of time, there was an exclusive sales representative agreement. The Court found that the agreement entitled TCS to a commission on the sale of a new Engico machine to Lawrence Paper in May 2019; the Court left the issue of commissions on two later sales for a jury to decide. Procedurally, the Court granted summary judgment on Count I, a breach of contract claim, and Count II, a claim under the Illinois Sales Representative Act ("IRSA"), 820 ILCS 120/0.01 *et seq.*, but only to the extent those claims were based on commission due for the 2019 Lawrence Paper sale. Because the evidence established the unpaid commission for that sale in euros that needed to be converted dollars and because there remained questions about the propriety and amount of other damage components, the Court sought further input from the parties.

## II. Damages Calculation

### A. Compensatory Damages for Unpaid Commission

TCS has responded by offering a basis for calculating compensatory damages due to the breach of the contract to pay a commission on the 2019 Lawrence Paper sale: €180,000 converted at the exchange rate of $1.1233, the rate on May 19, 2019, the date of the sale, for a commission due of $202,194. Engico does not dispute this calculation. Accordingly, the Court finds that compensatory damages due for the unpaid commission on Count I, to the extent it is based on the 2019 Lawrence Paper sale, is $202,194.

### B. Prejudgment Interest

TCS asks for prejudgment interest at the rate of 5% under the Illinois Interest Act, 815 ILCS 205/2, on Count I from May 19, 2019, because Engico acknowledged the full commission was due yet failed to pay it. Engico does not specifically oppose the request for prejudgment interest, although it argues its failure to pay was the result of a legitimate legal dispute.

The Interest Act provides that creditors shall pay prejudgment interest at a rate of 5% "on money withheld by an unreasonable and vexatious delay of payment."  815 ILCS 205/2.  The Court has discretion under Illinois law whether to award prejudgment interest.  *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 630 (7th Cir. 2009); *In re Est. of Feinberg*, 6 N.E.3d 310, 344 (Ill. App. Ct. 2014).

The Court believes that Engico's failure to pay the 2019 Lawrence Paper commission after entry of this order is unreasonable and would entitle TCS to prejudgment interest beginning today.  To the extent TCS requests prejudgment interest from May 19, 2019, to today, the Court reserves the question for trial when it can review the evidence and exercise its discretion to determine whether Engico's delay in paying commission on the 2019 Lawrence Paper sale was unreasonably or vexatiously delayed.  It will wait until the conclusion of the case to calculate the total prejudgment interest award.

    C.    Exemplary Damages

TCS asks the Court for exemplary damages on Count II of three times the amount of its compensatory damages for the 2019 Lawrence Paper sale.  Engico argues that its conduct did not rise to the level of egregiousness warranting exemplary damages at all, much less exemplary damages of three time the unpaid commission.

It is true that the ISRA states that a principal who fails to timely pay commissions "*shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative.*"  820 ILCS 120/3 (emphasis added).  However, despite the mandatory language in the statute, Illinois courts "award exemplary damages only when the sales representative proves that the principal willfully and wantonly refused to pay.  Illinois courts caution against awarding exemplary damages under the

Sales Act except to punish and deter intentional or egregious conduct." *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 573 (7th Cir. 1995) (internal citations and quotations omitted). *Maher & Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1008 (Ill. App. Ct. 1994) ("Although the statute makes no mention of bad faith or culpability, case law in this State makes it clear that punitive damages should not be awarded absent a finding of culpability that exceeds bad faith."); *see Loitz v. Remington Arms Co.*, 415, 563 N.E.2d 397, 402 (Ill. 1990) (citing *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353 (Ill. 1978); Restatement (Second) of Torts § 908(2) (1979)).

Under Illinois law, the preliminary question of whether a defendant can be subject to exemplary damages is a legal decision for the Court. *Cent. Tower Exch. Corp. v. German Motor Parts GmbH*, 518 F. Supp. 3d 1233, 1245 (C.D. Ill. 2021) (citing *Parker v. Four Seasons Hotel, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *see also Kelly v. McGraw-Hill Cos., Inc.*, 865 F. Supp. 2d 912, 920, 920 n.6 (N.D. Ill. 2012). It is then for the jury to decide the measure of those damages. *Kelly v. McGraw-Hill Companies, Inc.*, 865 F. Supp. 2d 912, 921 (N.D. Ill. 2012).

Based on the evidence in the record, that Court cannot say definitively that Engico's conduct, at least with respect to the 2019 Lawrence Paper sale commission, does not warrant exemplary damages. However, the Court will reserve the final decision of whether to allow exemplary damages once it hears the evidence at trial and considers Engico's conduct after entry of this order setting the amount of the commission due for the 2019 Lawrence Paper sale. If there is evidence Engico behaved in a truly egregious manner that was beyond bad faith, it will allow the question of exemplary damages to go to the jury.

D.    Attorney's Fees and Costs

The ISRA also requires a principal to pay a prevailing sales representative's reasonable attorney's fees and costs to collect improperly paid commissions. 820 ILCS 120/3. Unlike with

exemplary damages, no culpability is required. *Cent. Tower Exch. Corp. v. German Motor Parts GmbH*, 518 F. Supp. 3d 1233, 1246, 2021 WL 493407 (C.D. Ill. 2021) (citing *Maher & Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1009 (Ill. App. Ct. 1994)). So long as the principal failed to pay in a timely manner, fees and costs shall be awarded.

The Court will wait to determine the amount of reasonable fees and costs until the end of the case when it can more easily determine the fees and costs reasonably attributable to this portion of Counts I and II.

## III.   Rule 54(b) Judgment

TCS asks the Court to enter judgment on the parts of Counts I and II for which it has already been granted summary judgment and for which damages have been determined. Because other claims against Engico are still pending, any judgment entered by the Court at this time must be pursuant to Federal Rule of Civil Procedure 54(b), which permits the Court to certify for appeal a judgment resolving only some claims. *See General Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 379 (7th Cir. 2011); *National Metalcrafters, Div. of Keystone Consol. Indus. v. McNeil,* 784 F.2d 817, 821 (7th Cir. 1986). Rule 54(b) states:

> **Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

"But the rule does not provide an open invitation for the district court to certify a ruling for interlocutory appeal." *Rankins v. Sys. Sols. of Kentucky, LLC*, No. 21-2505, 2022 WL 2662141, at *2 (7th Cir. July 11, 2022). District courts are not to utilize Rule 54(b) unless there

is a good reason for doing so.  *United States v. Ettrick Wood Prods., Inc.*, 916 F.2d 1211, 1218 (7th Cir. 1990).  The decision to certify a final judgment as to fewer than all claims in a case is left to the sound discretion of the district court.  *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7 (1980); *Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064, 1066 (7th Cir. 1987).

In determining whether to grant judgment under Rule 54(b), the Court must first determine whether the judgment is final in the sense that it is "'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'"  *Curtiss-Wright*, 446 U.S. at 7 (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956)); *accord Rankins*, 2022 WL 2662141, at *2; *General Ins. Co.*, 644 F.3d at 379.  To determine whether an order is final, the Court must "ask whether there is significant factual and legal overlap between the claim proposed for appeal and the part of the case pending in the district court."  *Rankins*, 2022 WL 2662141, at *2.  Where claims are substantively intertwined – such as, for example, where the pending claims factually overlap with those for which a Rule 54(b) judgment is sought – a Rule 54(b) judgment is inappropriate.  *See General Ins. Co.*, 644 F.3d at 380 (citing *Horn v. Transcon Lines, Inc.,* 898 F.2d 589, 593-95 (7th Cir. 1990)).

Then, the Court must determine whether there is any just reason for delay, taking into account the interests of judicial administration and the equities involved.  *Curtiss-Wright*, 446 U.S. at 8; *Rankins*, 2022 WL 2662141, at *2; *General Ins. Co.*, 644 F.3d at 379;  *Schieffelin*, 823 F.2d at 1065-66.  In attempting to prevent piecemeal litigation, the Court should "consider such factors as whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined [is] such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals."  *Curtiss-Wright*, 446 U.S. at 8; *see ODC Commc'ns Corp. v. Wenruth Invs.*, 826 F.2d

509, 512 (7th Cir. 1987).

At this point, there are too many outstanding, intertwining issues regarding the amounts awardable on Counts I and II with respect to the Lawrence Paper sale. The Court will therefore deny TCS's motion for entry of a Rule 54(b) judgment. However, the Court will consider its finding that Engico owes TSC compensatory damages in the amount of $202,194 in connection with TCS's motion for prejudgment attachment (Doc. 100).

## IV.    Conclusion

For the foregoing reasons, the Court:

- **DENIES** TCS's motion for entry of a Rule 54(b) judgment (Doc. 97);

- **FINDS** that Engico owes TCS $202,194 in compensatory damages on Count I for the unpaid commission for the 2019 Lawrence Paper sale;

- **RESERVES** for later disposition the questions of prejudgment interest, exemplary damages, attorney's fees, and costs; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:  July 22, 2022**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THOMPSON CORRUGATED SYSTEMS, INC. and
THOMPSON CORRUGATED SYSTEMS LLC,

                Plaintiffs,

    v.

ENGICO S.R.L.,

                Defendant.

Case No. 20-cv-122-JPG

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on the motion of plaintiffs Thompson Corrugated Systems, Inc. and Thompson Corrugated Systems LLC (collectively, "TCS") for an award of attorney's fees, costs, and prejudgment interest (Doc. 139). It also seeks to convert the amounts of the jury's verdict from euros to dollars. Defendant Engico S.r.l. has responded to the motion (Doc. 144), and TCS has replied to that response (Doc. 145). As a preliminary matter, the Court will grant TCS's motion for leave to file its overly long reply (Doc. 146).

**I.      Background**

This case arose out of a relationship between Engico and TCS that began in 2002 and went south in 2019. TCS alleged that in 2004 Engico orally agreed that TCS would jointly be the exclusive sales representative for Engico's products—machinery to produce corrugated materials—in North America, and that it would be paid on commission. The relationship was terminated in 2019.

TCS filed this lawsuit on January 30, 2020, to recover commissions it believed Engico owed for sales of Engico machines in 2019 to Lawrence Paper Company, in 2019 to President Container, and in 2020 to Welch Packaging. Count I was a claim for breach of contract; Count II was for violation of the Illinois Sales Representative Act ("IRSA"), 820 ILCS 120/0.01 *et seq.*;

Count III was for an accounting; and Count IV, pled in the alternative, was a claim for unjust enrichment.

The Court granted TCS partial summary judgment on Count I (breach of contract) and Count II (ISRA) based on the 2019 sale to Lawrence Paper and determined that the amount awardable for Count I is $202,194 in compensatory damages for unpaid commission for that sale (Docs. 95 & 108).  The Court further granted Engico summary judgment on Count IV (unjust enrichment/quantum meruit) (Doc. 95).

The remaining claims went to trial, and a jury rendered a verdict on Count I for compensatory damages in the amount of €192,000 based on the 2019 sale to President Container and for compensatory damages in the amount of €96,000 based on the 2020 sale to Welch Packaging.  As for Count II, the jury further found that Engico willfully and wantonly failed to pay commissions due to TCS in violation of the ISRA and that TCS was therefore entitled to exemplary damages in the amount of €120,000 for the 2019 sale to Lawrence Paper, in the amount of €60,000 for the 2019 sale President Container, and in the amount of €120,000 for the 2020 sale to Welch Packaging.

The Court sought further briefing from the parties on the questions of:

- whether to award prejudgment interest at the rate of 5% under the Illinois Interest Act "on money withheld by an unreasonable and vexatious delay of payment."  815 ILCS 205/2; and

- the amount of the mandatory award of fees and costs to a prevailing party under the ISRA, 820 ILCS 120/3.

TCS also raises the question of converting the jury verdict from euros to dollars.  Those issues are now before the Court.

## II.     Analysis

### A.     Currency Conversion Rate

The Court has already converted the compensatory damage amount for unpaid commissions for the Lawrence Paper sale from euros to dollars, ending up with a compensatory damage award of $202,194.  To arrive at this figure, the Court used the euro/dollar conversion rate from May 19, 2019, the date of the sale.  Engico did not dispute this calculation when it was made, so has waived any objection.

TCS now asks the Court to convert the amounts in the jury's verdict, which was rendered in euros, to dollars as well.  Engico does not dispute that the Court should apply the conversion rate from the date of the sale, but it urges the Court to use the U.S. Federal Reserve published rate rather than the slightly different rates offered by TCS.  TCS does not object to use of the rate suggested by Engico.  Using those rates, the jury's verdict is converted as follows:

| Sale to | Count | Verdict Amount | Exchange Rate | Dollar Amount |
|---|---|---|---|---|
| Lawrence Paper | II | €120,000 | 1.1241 | $134,892 |
| President Container | I | €192,000 | 1.1123 | $213,562 |
| President Container | II | €60,000 | 1.1123 | $66,738 |
| Welch Packaging via Haire | I | €96,000 | 1.1041 | $105,994 |
| Welch Packaging via Haire | II | €120,000 | 1.1041 | $132,492 |

To the extent any party objects to the submission of an exemplary damages award to the jury, the Court confirms that, for the reasons set forth below in support of its prejudgment interest award, it would make the same findings had the question been before the Court.

3

A27

B.    Prejudgment Interest

TCS asks for prejudgment interest on compensatory damages at the rate of 5% under the
Illinois Interest Act, 815 ILCS 205/2, on Count I from the date of each machine's sale to the date
of entry of judgment.  Engico makes a *pro forma* objection repeating its position that its failure
to pay commissions on the President Container and Welch Packaging sales was not unreasonable
or vexatious but a good faith dispute that had not yet been settled.

The Interest Act provides that creditors shall pay prejudgment interest at a rate of 5% "on
money withheld by an unreasonable and vexatious delay of payment."  815 ILCS 205/2.  The
Court has discretion under Illinois law to award prejudgment interest under this statute.
*Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 630 (7th Cir. 2009); *In re Est. of
Feinberg*, 6 N.E.3d 310, 344 (Ill. App. Ct. 2014).

The Court has already determined any failure to pay the 2019 Lawrence Paper
commission after the Court's July 22, 2022, order (Doc. 108) would be unreasonable and would
entitle TCS to prejudgment interest on that amount from at least July 22, 2022.  The Court now
turns to the issues of prejudgment interest between the date of the Lawrence Paper sale (May 19,
2019) to July 22, 2022, and prejudgment interest on the President Container and Welch
Packaging sales.

The Court finds that Engico's failure to pay the commission on the Lawrence Paper sale
at the time of the sale—May 19, 2019—was not unreasonable or vexatious.  Engico had
conducted the sale independent of TCS and directly with Lawrence Paper.  Engico wrongfully
withheld the commission, which was due based on the industry practice of compensating
exclusive sales representatives for any sales within their territories, but it did not hide the sale
from TCS or display any other duplicity.  This was the first time Engico had failed to pay a
commission to TCS under their oral agreement, and the failure to pay was arguably not in bad

faith but was instead based on an honest misunderstanding of the customs and usages in the manufacturers' sales representative industry.  It is implicit in the jury's verdict that such a custom and practice was incorporated as a term of the sales representative agreement, and based on the credible expert testimony of Scott Lindberg as to industry custom and practice, the Court agrees that it was.  Engico was wrong about this, but this ignorance was not unreasonable or vexatious, at least the first time it failed to pay based on this misunderstanding.  Consequently, TCS is not entitled to prejudgment interest from as early as May 19, 2019.

The same is not true for the sales to President Container on October 30, 2019, and to Welch Packaging via Haire on January 20, 2020.  By the time TCS and Engico met on August 7, 2019, to discuss the relationship, Engico should have been disabused of its notion that it did not need to pay TCS based on industry customs and practices.  In fact, around the time of the meeting, Engico offered to pay TCS a commission on the Lawrence Paper sale, evidence of its epiphany as to its contractual obligations.

Additionally, there is evidence of Engico's bad faith in failing to pay commissions on the President Container and Welch Packaging sales.  Before either of those sales, Engico hired the Haire Group as its sales representative while it already had an exclusive arrangement with TCS, a clear violation of the obligation to act in good faith with its exclusive sales representative. Engico then offered TCS a reduced commission on sales concluded before the end of 2019, then went through a transactional shell game to consummate the Welch Packaging sale in January 2020 and to make it appear as if the sale was not actually to Welch Packaging, a customer developed by TCS.  These shenanigans are evidence of bad faith and lead to the conclusion that the delay in payments for those commissions was unreasonable and vexatious.

In light of these facts, established by credible evidence at trial, the Court finds that Engico's failure to pay the commissions became unreasonable and vexatious as follows:

| Sale to | Amount | Date delay became unreasonable and vexatious |
|---|---|---|
| Lawrence Paper | $202,194 | August 7, 2019 |
| President Container | $213,562 | October 30, 2019 |
| Welch Packaging via Haire | $105,994 | January 23, 2020 |

Accordingly, TCS is entitled to prejudgment interest at the rate of 5% under the Illinois Interest Act for each unpaid commission from its respective date listed above to the date of judgment. This result is consistent with the jury's findings that Engico willfully and wantonly failed to pay commissions on a timely basis and was therefore subject to exemplary damages under the ISRA. The Court leaves it to the parties to calculate the sum certain based on this method of computation.

C.    Accounting

Count III, TCS's claim for an accounting of Engico's other sales in TCS's territory since January 1, 2018, is included in the Final Pretrial Order (Doc. 11) but since then has essentially been lost in the shuffle.  Engico claims TCS has abandoned the claim, and indeed in TCS's closing argument counsel said it was not seeking to get paid for sales other than the complete machines.  Nevertheless, in the absence of a request for voluntary dismissal, the Court must dispose of the claim.

An accounting is an equitable remedy requiring a party to give "a statement of receipts and disbursements to and from a particular source." *Tufo v. Tufo*, 196 N.E.3d 58, 82 (Ill. App. Ct. 2021).  There is no absolute right to an accounting, which should be awarded only on equitable principles based on the particular facts of the case. *Id.*

TCS did not produce sufficient evidence at trial that an accounting is warranted.  To the extent it claims Engico made sales in North America of products other than complete machines

6

**A30**

during the relevant time period for which it would owe TCS a commission, TCS had the

opportunity to ferret out any such sales in discovery.  At that point, it could have moved to

amend the complaint to add specific allegations of those sales to the allegations of the three

complete machine sales.  It did not.  At the trial itself, Fred Thompson Sr. mentions Engico's

failing to give TCS billing information on other sales made "behind our back" (Trial Tr. 324:18-

19), his generally lack of knowledge whether Engico had customers in North America that it did

not disclose to TCS (*see, e.g.,* Trial Tr. 430-36, 478), and Engico's not ever paying TCS for

selling spare and replacement parts (Trial Tr. 637:9-12; 642:22-643:2).  Other than there, there

was no evidence suggesting equity requires the Court to order an accounting.

It is clear that the main thrust of this case—and the main source of damages—was unpaid

commissions for the sales of complete machines, not smaller sales of parts.  While the issue of

unpaid commissions on complete machines was resolved in the plaintiff's favor, there was

simply not enough non-speculative evidence presented to suggest an accounting would yield any

relevant information.  Therefore, TCS has not carried its burden of establishing by a

preponderance of the evidence that it is entitled to an accounting.  The Court will enter judgment

on Count III in Engico's favor.

    D.    <u>Attorney's Fees and Court Costs</u>

The ISRA requires a manufacturer principal to pay a prevailing sales representative's

reasonable attorney's fees and court costs to collect improperly paid commissions.  820 ILCS

120/3.  Unlike with exemplary damages, no culpability is required.  *Cent. Tower Exch. Corp. v.

German Motor Parts GmbH*, 518 F. Supp. 3d 1233, 1246 (C.D. Ill. 2021) (citing *Maher &

Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1009 (Ill. App. Ct. 1994)).  So long as the

principal failed to pay in a timely manner, fees and costs must be awarded.

1.   Attorney's Fees

TCS asks the Court to award more than $500,000 in attorney's fees for work at all stages of this litigation, including the pending fee request.  Engico contends the request is excessive because (1) fees are not awardable for work other than litigating the ISRA claim, (2) a block billing method prevents proper examination of the time spent, (3) two of the attorneys' billing rates exceed the rate of a local attorney doing similar work and the rate one counsel represented during the relevant period as his normal billing rate, and (4) the time spent exceeded what was necessary because TCS's attorneys did not delegate work to associates or paralegals and duplicated the work they did do.

a.   Lodestar Calculation

Attorney's fee awards begin with a lodestar calculation.  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The lodestar method involves "multiplying the number of hours the attorney reasonably expended on the litigation times a reasonable hourly rate." *Mathur v. Board of Trustees of S. Ill. Univ.*, 317 F.3d 738, 742 (7th Cir. 2003); *Animal Legal Def. Fund v. Special Memories Zoo*, 42 F.4th 700, 707 (7th Cir. 2022).  "[T]he lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 551 (emphasis in original).  It is strongly presumed to be sufficient because many relevant factors are already accounted for in that calculation. *Id.* at 552-53; *Animal Legal Def. Fund*, 42 F.4th at 707.

However, the Court has discretion to make adjustments to the amount for factors specific to the litigation that the lodestar method did not take into account. *Animal Legal Def. Fund*, 42 F.4th at 707; *see Cooper v. Retrieval-Masters Creditors Bureau, Inc.*, 42 F.4th 675, 685 (7th Cir. 2022).  Such factors can include "the complexity of the legal issues involved, the degree of

8

**A32**

success obtained, and the public interest advanced by the litigation." *Cooper*, 42 F.4th at 682 (internal quotations omitted).  They can also include the rejection of a substantial settlement offer, the proportionality between the damage amount and the fee request.  *Id.* at 685, 686.

The party seeking fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437; *accord Vega v. Chi. Park Dist.*, 12 F.4th 696, 702 (7th Cir. 2021).  "Once the petitioning party provides evidence of the proposed fees' reasonableness, the burden shifts to the other party to demonstrate the award's unreasonableness." *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 759 (7th Cir. 2012); *accord Vega*, 12 F.4th at 703.

###### b.   Billing Rate

TCS's primary attorneys are Adam J. Glazer, William R. Klein, and Brandon John Zanotti.  Glazer's and Klein's hourly rates increased over the two and a half years of this litigation—Glazer's from $425 to $450 and Klein's from $415 to $440.  Zanotti, who was brought in for trial, charges $350 per hour.  TCS has supported the reasonableness of these billing rates with an affidavit from G. Patrick Murphy, who resides and practices in Southern Illinois and who himself charges $500 per hour.  Murphy is a retired federal judge who has reviewed hundreds of fee applications as a presiding judicial officer and as a practicing attorney and is familiar with rates charged by attorneys in commercial litigation in Southern Illinois.

Engico does not object to Zanotti's rate but argues that the rates of Glazer and Klein, both of whom practice in Chicago, are excessive for work in Southern Illinois.  It faults TCS for not hiring local counsel to handle this litigation at lower local rates like Zanotti's, $350 per hour.  Engico points to another affidavit by Glazer in another case during the relevant time period in which he states his normal hourly billing rate is $395.  It argues that Glazer and Klein should be limited to Zanotti's rate of $350 or, at the most, $395 as Glazer represented in his other case.  In

9

**A33**

support of this position, Engico submits an affidavit from Joseph Bleyer, who resides and has practiced for 37 years in the Southern District of Illinois and is familiar with the attorney's fee award process.  Part of Bleyer's practice is defending civil rights cases under 42 U.S.C. § 1983 and requests for fees under 42 U.S.C. § 1988.

The Seventh Circuit Court of Appeals has clear set forth how to determine a reasonable hourly rate:

> A reasonable hourly rate is based on the local market rate for the attorney's services.  The best evidence of the market rate is the amount the attorney actually bills for similar work, but if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community and evidence of rates set for the attorney in similar cases.

*Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014) (internal citation omitted); *accord Vega v. Chi. Park Dist.*, 12 F.4th 696, 705 (7th Cir. 2021).  The fee applicant bears the burden of proving the market rate, but once he provides evidence of that rate, the opposing party may attempt to convince the Court that a lower rate is justified.  *Vega*, 12 F.4th at 705; *Stark v. PPM Am., Inc.*, 354 F.3d 666, 675 (7th Cir. 2004).  Where out-of-town counsel's rate exceeds that of local practitioners, the Court should still use the counsel's actual billing rate unless the Court finds that a local attorney could have done an equivalent job and there was no reason for out-of-town counsel to perform the work.  *Mathur v. Board of Trustees of S. Ill. Univ.*, 317 F.3d 738, 744 (7th Cir. 2003).

TCS has provided affidavit evidence of the customary hourly rates for commercial litigation for the billing professionals during the life of this case.  Glazer explains in a supplemental affidavit that the lower hourly rate of $395 he charged in another case to another client was because when that case began in 2018, his rate was $395 and, as an accommodation to that client, he continued to charge the same rate throughout the litigation.  Thus, that lower rate is not inconsistent with billing $425 per hour to begin with in this case, which was filed in 2020,

and for which Glazer did not extend the same voluntary rate-freeze.

The Court is satisfied from Glazer's affidavits that his and Klein's rates are the local market rates for attorney services in cases of this type. Glazer and Klein have substantial experience representing manufacturers' sales representatives in disputes with manufacturers, and Engico has not pointed to any local counsel with this type of knowledge and experience who was qualified and could have been retained at a lower rate for this complex, international case. Murphy's affidavit confirms that those rates are not out of the mainstream for local counsel in this type of commercial litigation.

Engico does not challenge the rates TCS proposes for the other professionals who worked on this case, and the Court sees nothing out of the ordinary about those reasonable rates.

For these reasons, the Court finds that billing rates requested are appropriate.

<div style="text-align:center">c.   <u>Hours Expended</u></div>

In its original motion, TCS's attorneys and paralegals spent 1,329.8 hours on this case. It has supported the hours worked with billing statements made contemporaneously with the work done, although often in "block billing" form where several tasks are listed in one block of time without distinguishing how long each took to accomplish. In its reply brief, TCS asks for additional attorney's fees incurred in seeking prejudgment interest.

Again, Engico focuses its criticism on Glazer's and Klein's time, not the other professionals working for TCS on this case. Engico contends TCS's "block billing" is insufficient to justify the fees requested because there is no way for the Court to determine whether the time spent on a particular task was reasonable and necessary if it is camouflaged among other tasks done by the same person on the same day. As an example, it points to block billing entries from August 3, 2022, for multiple hours of work by Glazer and Klein that include remote attendance at a 20-minute hearing and other tasks (Doc. 139 at 55). It notes that a

<div style="text-align:center">11</div>

<div style="text-align:center">**A35**</div>

majority of Glazer's and Klein's hours are contained in block billing entries.  Engico also asks

the Court to reduce the hours expended by Glazer and Klein because their work was inefficient

and duplicative.  Both Glazer and Klein are partners at their firm, and they performed much work

themselves rather than delegating it to cheaper associate attorneys.  Engico proposes reducing

Glazer's or Klein's hours worked by more than 300 hours to compensate for the foregoing

complaints.  Finally, Engico points to one 0.3 hour entry by Glazer in May 2022 that was

actually for work on another matter.

It is true that TCS's counsel spent a rather large amount of time litigating this case.

However, the particular circumstances of this case show that it required a large amount of time.

Engico and its personnel reside in Italy while this litigation proceeded in the United States.

Discovery was necessarily more burdensome because there was no written contract that could

simply be produced and litigated;  its existence, terms, and performance needed to be

reconstructed through depositions, experts, and paper trails.  Depositions were complicated and

protracted in part because of the language barrier between the litigants and attorneys.  In

addition, discovery was voluminous, and pretrial motion practice was active.  And this was all

against the background of the COVID-19 pandemic, which complicated everything to do with

litigation, including the travel plans of participants residing in Italy and elsewhere.  The trial of

this case was set and continued five times by pandemic exigencies or the requests of TCS and/or

Engico.  Each time it was reset, the trial preparation period for the earlier trial date had already

begun, especially the last two continuances, which occurred about a month before the trial was to

start.  The constant rescheduling necessarily resulted in conducting some trial preparation

activities multiple times.  This is not anyone's fault but is simply one of the hazards of litigating

a complicated international case during a pandemic.  If Engico did not want to risk a ballooning

attorney's fee award in light of the circumstances, it could have more zealously pursued pretrial

settlement negotiations or made an offer of judgment.  Having set forth the background against

which this litigation unfolded, the Court turns to Engico's specific criticisms about TCS's

counsel's hours expended on the case.

As noted above, the party seeking fees is responsible for documenting the hours worked

with the "level of detail that paying clients would be likely to find acceptable."  *Vega v. Chi.

Park Dist.*, 12 F.4th 696, 703 (7th Cir. 2021).  An attorney's billing statement should be

"sufficiently detailed to permit adequate review of the time billed to specific tasks."  *Cintas

Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008).  The Court should not allow payment for

hours spent by counsel that would not ordinarily be billed to a paying client or are easily

delegated to non-professional staff such as a secretary.  *See Spegon v. Catholic Bishop of Chi.*,

175 F.3d 544, 553 (7th Cir. 1999).  Such hours are not reasonable or necessary.  *Id.*  The Court

may also disallow hours as not reasonably expended if they are "excessive, redundant, or

otherwise unnecessary."  *Stark v. PPM Am., Inc.*, 354 F.3d 666, 674 (7th Cir. 2004).  However,

"determining what qualifies as a 'reasonable' use of a lawyer's time is a highly contextual and

fact-specific enterprise," so district courts have wide latitude to set awards of attorney's fees.

*Sottoriva v. Claps*, 617 F.3d 971, 975 (7th Cir. 2010).

There is nothing inherently wrong with "block billing," although it is not likely to

provide the best possible descriptions of an attorney's work.  *See Farfaras v. Citizens Bank &

Tr.*, 433 F.3d 558, 569 (7th Cir. 2006).  Nevertheless, it is within professional norms not to

itemize bills by every single task.  "[H]aving attorneys keep detailed records is a cost that many

clients prefer to avoid," *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 520

(7th Cir. 1999), and block billing can be an acceptable compromise between, on the one hand,

incurring additional fees for keeping microscopically detailed track of time and, on the other

hand, accounting for time spent.  Indeed, both parties' attorneys used block billing in their

timesheets to some extent.

The Court has reviewed TCS's counsel's block billing entries and finds that they contain the level of detail acceptable when billing a private client.  Even though they are frequently billed in blocks, the level of detail of the tasks within the blocks is sufficient to allow the Court—and a paying client—to determine what the attorney did and that the time spent for the sum of all the listed activities within a block was not unreasonable.  Engico's request, supported by Bleyer's affidavit, to cut substantial chunks of time from the bill simply because of block billing is unreasonable.

Engico asks the Court to reduce the hours expended by Glazer and Klein because their work was inefficient for failing to delegate it to lower-billing professionals and for duplicating each other's work.  However, Engico makes only general assertions and has not pointed to any specific billing entry with a task that it believes should have been done by someone other than Glazer and Klein or any specific billing entries that unreasonably or unnecessarily duplicate the other's work.[1]  Indeed, the Court's examination of the pretrial preparation period in early August reveals that administrative tasks were performed by paralegals, not Glazer or Klein, and that Glazer and Klein were faced with multiple issues—trial preparation, pretrial attachment, and settlement negotiation, just to name a few—for which the time they billed seems reasonable in the aggregate.  Additionally, nothing jumps out at the Court from that review to show unreasonable duplicate tasks by Glazer and Klein.  In the absence of any specific citations to improperly billed tasks, the Court cannot say any other billed hours are excessive except for the

---

[1] Engico mentions 19 hours on jury instructions and 43.9 hours depositions for which Klein prepared but did not take.  It does not, however, point the Court to the billing entries with sufficient specificity for it to review them.  "Judges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)—or in 52 pages of billing entries.

14

**A38**

0.3 hours Glazer billed on another matter, which it will removed from Glazer's fee request.

To the extent Engico believes Glazer and Klein spent too much time on summary judgment briefing or trial preparation, there is no evidence Bleyer's opinion adequately considered the complexities of this case, the immensity of the tasks to be performed by a plaintiff's counsel preparing for trial at which the plaintiff carries the burden of proof, and the difficulties getting this case to trial that the Court has described above. As noted above, TCS's counsel did spend a lot of time litigating this case, nothing suggests the time was excessive, and that work clearly enabled TCS to achieve an excellent result on summary judgment and at trial.

In sum, TCS has adequately supported as reasonable the time spent litigating this case, and, with one exception, Engico has not carried its burden of demonstrating the amount of time was unreasonable. *See Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 759 (7th Cir. 2012); *Vega v. Chi. Park Dist.*, 12 F.4th 696, 703 (7th Cir. 2021). The one exception is the 0.3 hours Glazer misbilled to this case. Accordingly, the Court will deduct $135.00 ($450 x 0.3) from the amount TCS requests in attorney's fees.

In light of the foregoing, the lodestar calculation based on hours reasonable expended at reasonable hourly rates is $499,184.50. This amount includes the $477,864.50 requested for work by Glazer's firm reduced by $135.00, and the $21,455.00 requested for work by Zanotti's firm.[2]

The Court declines to award fees at this time for TCS's counsel's work on the current motion. Those fees were requested in their reply brief to which Engico did not have an opportunity to respond. The Court will not delay entry of judgment to await a decision on those fees. *See* Fed. R. Civ. P. 58(e). It will consider that request post-judgment and enter a

---

[2] To the extent these sums differ from the amounts requested in TCS's motion or Glazer's affidavit, the Court has relied on the exhibits to support its calculations.

supplemental fee award if necessary. The Court now turns to potential adjustments to the

lodestar calculation.

d.     Segregation of Counts

Engico asks the Court to lop off 75% of the lodestar amount because fees are only

awardable on Count II, the ISRA count. The ISRA does not authorize a fee award for the other

three counts, two of which TCS unquestionably lost. Engico argues that TCS's counsel was

negligent in not keeping separate billing entries for work done on Count II and that, as a

consequence, the Court cannot separate out the work for which fees are awardable under the

ISRA and should reduce the fee requested accordingly. Engico counters that because all claims

were based on a common core of facts, the Court should award fees irrespective of any

attachment to a particular legal theory.

*Hensley v. Eckerhart*, 461 U.S. 424 (1983), sets forth the general rules for awarding

attorney fees in multiple-claim cases where a plaintiff did not prevail on all claims, albeit in the

context of a fee award under 42 U.S.C. § 1988. *Hensley* established that, under the lodestar

method, the extent of a plaintiff's success should be considered when determining a "reasonable"

fee award, including whether it incurred fees pursuing unsuccessful claims. *Id.* at 433. In this

situation, the Court asks two questions: "First, did the plaintiff fail to prevail on claims that were

unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of

success that makes the hours reasonably expended a satisfactory basis for making a fee award?"

*Id.* at 434; *accord Vega v. Chi. Park Dist.*, 12 F.4th 696, 703 (7th Cir. 2021).

Where two entirely distinct and separate claims in the same case request relief based on

different facts and legal theories, and counsel's work on one claim is unrelated to work on the

other claim, counsel's work on the unsuccessful claim cannot be part of a reasonable fee award.

*Hensley*, 461 U.S. at 434-35; *Vega*, 12 F.4th at 703 (citing *Ibrahim v. U.S. Dep't of Homeland*

16

**A40**

*Sec.*, 912 F.3d 1147, 1174 (9th Cir. 2019).

On the other hand, where multiple claims "involve a common core of facts" or are "based on related legal theories," and where counsel's time is "devoted generally to the litigation as a whole," it may be difficult to tease out work done on any one particular claim. *Hensley*, 461 U.S. at 435; *Vega*, 12 F.4th at 703 (paraphrasing *Hensley*'s test as whether the claims "arose out of the same course of conduct"); *see Munson v. Milwaukee Bd. of Sch. Dirs.*, 969 F.2d 266, 272 (7th Cir. 1992). In that case, the Court should not treat the causes of actions as discrete claims and should consider the significance of the overall relief obtained in the lawsuit as a whole. *Hensley*, 461 U.S. at 435. If plaintiff's counsel achieved "excellent results," counsel should recover a full fee award without a reduction for the lack of success on every contention in the lawsuit or the rejection of alternative legal theories. *Id.*

It would be improper to reduce the lodestar amount in this case simply because TCS did not prevail on all claims or receive the full amount of exemplary damages it requested. All four counts in this case involved the same core of facts—TCS's relationship with Engico and Engico's obligations to pay commissions in accordance with that relationship. They also involved related legal theories, so much so that the first element in TCS's ISRA claim *was the very question* at issue in the breach of contract claim—whether Engico owed TCS a commission under their oral agreement. Counts I and II are inextricably intertwined, and attributing work on the case to one or the other counts is neither feasible nor productive. Work on Count I was essentially work on Count II.

Count IV, which TCS clearly lost simply because there *was* a contract between the parties, was an equitable claim for unjust enrichment pled as an alternative to Count I and involved the exact facts merely under a different legal theory. Likewise, Count III is grounded on the assertion that the contract alleged in Count I existed and that there was good reason to

17

**A41**

suspect Engico was not abiding by it in instances other than the three specific sales at issue in this case. Count III was the least significant claim in this case and was likely to have had minimal impact, if any, on the number of hours billed. Accordingly, even though TCS lost on those two counts, no adjustment to the lodestar is warranted simply because of those losses.

In light of the Court's summary judgment ruling and the jury verdict, the Court finds that TCS obtained "excellent results" even if it did not recover the entire amount of exemplary damages it requested and did not prevail on every claim. TCS substantially prevailed in the gravamen of its complaint—that Engico owed it commissions and willfully and wantonly, and sometimes unreasonably and vexatiously, withheld the payments due—and was awarded all of the compensatory damages it sought. No reduction of the lodestar amount, much less a 75% reduction, is warranted based on the fact that only Count II included an express award of attorney's fees or the fact that TCS failed to segregate its billing for litigation of Count II.

In sum, no compelling justification for an adjustment to the lodestar calculation has been offered, so the Court will award the lodestar-calculated fees.

### 2. Court Costs

TCS asks for costs in the amount of $91,559.34, which includes the bond to secure prejudgment attachment, expert fees and expenses, transcript expenses, travel expenses, interpreter, and run-of-the-mill litigation expenses. Engico argues that there is no authority to recover the cost of obtaining a bond, court reporter fees, deposition fees of testifying witnesses; that certain substantial travel costs could have been avoided by hiring local counsel; and that the expert witness fee lacks an itemization of the expert's charge and is not supported by legal authority.

When reviewing a request for costs, the Court asks two questions: "(1) whether the cost imposed on the losing party is recoverable and (2) if so, whether the amount assessed for that

item was reasonable." *Majeske v. City of Chi.*, 218 F.3d 816, 824 (7th Cir. 2000), *cited by Lane v. Person*, 40 F.4th 813, 815 (7th Cir. 2022).

In this case, there are two sources of a cost award: state and federal. Under state law, the ISRA requires a noncompliant manufacturer principal to pay a prevailing sales representative's reasonable "court costs" to collect improperly paid commissions. 820 ILCS 120/3. In federal court, the Court presumes that a prevailing party is entitled to "costs" as a matter of course, *Krocka v. City of Chi.*, 203 F.3d 507, 518 (7th Cir. 2000), but has the discretion to deny or reduce costs where warranted, *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987).

Illinois law distinguishes "court costs" from "litigation costs" and defines "court costs" as "charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees," as well as "subpoena fees, and statutory witness fees." *Vicencio v. Lincoln-Way Builders, Inc.*, 789 N.E.2d 290, 295 (Ill. 2003); *accord DiFranco v. Kusar*, 90 N.E.3d 556, 566 (Ill. App. Ct. 2017). "Witness fees" include statutory witness and mileage fees. *Vicencio*, 789 N.E.2d at 304. "Litigation costs," on the other hand, are "the expenses of litigation, prosecution, or other legal transaction." *Id* at 395. (internal brackets omitted).

In federal court, there is a presumption that the cost items enumerated in 28 U.S.C. § 1920 are awardable to a prevailing party under Federal Rule of Civil Procedure 54(d). *Lane v. Person*, 40 F.4th 813, 815 (7th Cir. 2022). Those taxable costs are:

(1)   Fees of the clerk and marshal;
(2)   Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3)   Fees and disbursements for printing and witnesses;
(4)   Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5)   Docket fees under section 1923 of this title;
(6)   Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section

19

**A43**

1828 of this title.

28 U.S.C. § 1920.

The specific items to which Engico objects are:

*Cost of Bond*:  The Court declines to award as costs the amount TCS was required to expend to obtain a bond in support of its prejudgment attachment request.  The decision to seek prejudgment attachment and to obtain the bond was TCS's decision, not a requirement imposed by the Court.  The only requirement imposed by the Court was a deadline for posting the bond. Furthermore, TCS has cited no authority for awarding the cost of obtaining a bond for prejudgment attachment.

*Attorney Travel Costs*:  Reasonable travel costs are awardable as part of a reasonable attorney's fees.  The travel costs requested in this case are reasonable in light of the circumstances.  Those costs are not rendered unreasonable simply because TCS did not hire other lawyers living in Southern Illinois.

*Expert Witness Fees*:  The witness fee allowed in 28 U.S.C. § 1920(3) includes only amounts allowed under 28 U.S.C. § 1821 unless a statute or contract provides otherwise.  *Lane*, 40 F.4th at 815 (citing *Crawford Fitting Co. v. J.T. Gibbons*, 482 U.S. 437, 441 (1987)).  Under 28 U.S.C. § 1821, a witness is only entitled to a *per diem* fee of $40 for every day spent in deposition or trial or getting to deposition or trial, along with travel and subsistence expenses. "[A] party's own expert witness fee generally is not recoverable as a cost."  *Lane*, 40 F.4th at 815; *Abernathy v. E. Ill. R.R. Co.*, 940 F.3d 982, 994-95 (7th Cir. 2019); *compare Halasa v. ITT Educ. Servs.*, 690 F.3d 844, 851-52 (7th Cir. 2012) (noting expert fees may be awarded under Federal Rule of Civil Procedure 26(b)(4)(E) for time spent responding to discovery); *Friedrich v. Chi.*. 888 F.2d 511 (7th Cir. 1989) (under 28 U.S.C. § 1988, expert witness fees awardable to plaintiff as attorney's fee); *Heiar v. Crawford Cnty., Wis.*, 746 F.2d 1190, 1203 (7th Cir. 1984)

20

**A44**

(under 28 U.S.C. § 1988, some non-taxable expenses that do not fall within the statutory definition of "costs" are reimbursable as part of reasonable attorney's fees, citing "expenses for such things as postage, long-distance calls, xeroxing, travel, paralegals, and expert witnesses"). Considering that the fee award in this case is not requested pursuant to Federal Rule of Civil Procedure 26 or 28 U.S.C. § 1988, the Court will allow costs for TCS's expert Scott Lindberg in the following amount:

| | |
|---|---|
| $40/day for 3 days = | $120.00 |
| July 14, 2021, deposition (no travel) | |
| August 24, 2022, trial testimony (travel August 23, 2022) | |
| Travel expenses = | $1,334.72 |
| **Total Expert Witness Fees** | **$1,454.72** |

*Court Reporter Attendance and Transcript Fees*: These fees are authorized as "court costs" under Illinois law and/or as fees for printed or electronically recorded transcripts necessarily obtained for use in the case under 28 U.S.C. § 1920(2).

*Deposition Fees*: These fees are authorized as fees for printed or electronically recorded transcripts necessarily obtained for use in the case under 28 U.S.C. § 1920(2). The Court notes that depositions can be necessary even where the deponent testifies in person at trial, including when used on summary judgment as in this case.

*Miscellaneous Items*: Engico objects a handful of other costs TCS requests without citing legal authority to support its objection. The Court has reviewed the list of expenses and, with two exceptions, finds the items authorized by the foregoing authority and reasonable. It will therefore award those items as costs. The two exceptions are two expenses labeled "Other" in the amount of $1,665.00 on March 24, 2021. The Court will not award those amounts as costs because they are not adequately explained.

In sum, the Court will award TCS costs as follows:

| Costs of Bond | $0 |
| Expert Witness Fee:  Scott Lindberg | $1,454.72 |
| Billed Expenses (Doc. 139, Ex. 3, excluding "Other" charges) | $13,342.92 |
| Court Reporter/Transcript Fees | $4,926.70 |
| **Total** | **$19,724.34** |

Any other requested costs are not adequately supported by evidence of their nature and/or

necessity.

### IV.   Conclusion

For the foregoing reasons, the Court:

- **GRANTS** TCS's motion for leave to file an overly long reply brief (Doc. 146);

- **GRANTS in part** and **DENIES in part** TCS motion for an award of attorney's fees, costs, and prejudgment interest, and to convert the jury's verdict from euros to dollars (Doc. 139);

- **ORDERS** a total compensatory damage award on Count I of $521,750.00 ($202,194.00 for the Lawrence Paper sale; $213,562.00 for the President Container sale; and $105,994.00 for the Welch Packaging sale);

- **ORDERS** a total exemplary damage award on Count II of $334,122.00 ($134,892.00 for the Lawrence Paper Sale; $66,738.00 for the President Container sale; and $132,492.00 for the Welch Packaging sale);

- **ORDERS** that TCS shall be awarded prejudgment interest under the Illinois Interest Act on Count I at the rate of 5% as follows:  on $202,194.00 as of August 7, 2019, until the date of judgment; on $213,562.00 as of October 30, 2019, until the date of judgment; and on $105,994.00 as of January 23, 2020, until the date of judgment;

- **DISMISSES** Count III **with prejudice**;

- **ORDERS** that TCS is entitled to an award of attorney's fees in the total amount of $499,184.50 ($477,729.50 for work by Glazer's firm and $21,455.00 for work by Zanotti's firm);

- **ORDERS** that TCS is awarded costs in the total amount of $19,724.34; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

To the extent TCS seeks attorney's fees and costs incurred in its efforts to recover

prejudgment interest and fees post-verdict, it may file a motion seeking such an award within 14

days after entry of this order.  Pursuant to Federal Rule of Civil Procedure 58(e), the Court will

not delay entry of final judgment for a potential supplemental cost or fee award.

**IT IS SO ORDERED.**
**DATED:  January 17, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

23

**A47**

UNITED STATES DISTRICT COURT
for THE SOUTHERN DISTRICT OF ILLINOIS

THOMPSON CORRUGATED SYSTEMS, INC. and
THOMPSON CORRUGATED SYSTEMS LLC,

                Plaintiffs,

    v.

ENGICO S.R.L.,

                Defendant.

Case No. 20-cv-122-JPG

## **JUDGMENT**

       This matter having come before the Court, the issues having been heard, and the Court
having rendered a decision as to some matters and the jury having rendered a verdict as to others,

       IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered on Count I
(breach of contract) in favor of plaintiffs Thompson Corrugated Systems, Inc. and Thompson
Corrugated Systems LLC and against defendant Engico S.r.l. in the following amounts:

- $202,194.00 in compensatory damages for commissions due from the 2019 sale to
  Lawrence Paper Company, plus prejudgment interest under the Illinois Interest Act at the
  rate of 5% calculated from August 7, 2019;
- $213,562.00 in compensatory damages for commissions due from the 2019 sale to
  President Container, plus prejudgment interest under the Illinois Interest Act at the rate of
  5% calculated from October 30, 2019; and
- $105,994.00 in compensatory damages for commissions due from the 2020 sale to Welch
  Packaging, plus prejudgment interest under the Illinois Interest Act at the rate of 5%
  calculated from January 23, 2020;

for a total compensatory damage award for Count I of $521,750.00 plus prejudgment interest as
indicated above;

       IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered on Count II
(violation of the Illinois Sales Representative Act) in favor of plaintiffs Thompson Corrugated
Systems, Inc. and Thompson Corrugated Systems LLC and against defendant Engico S.r.l. in the
amount of:

- $134,892.00 in exemplary damages for commissions due from the 2019 sale to Lawrence
  Paper Company;
- $66,738.00 in exemplary damages for commissions due from the 2019 sale to President
  Container; and
- $132,492.00 in exemplary damages for commissions due from the 2020 sale to Welch
  Packaging;

for a total exemplary damage award for Count II of $334,122.00;

IT IS FURTHER ORDERED AND ADJUGED that judgment is entered on Count III (accounting) and Count IV (unjust enrichment/*quantum meruit*) in favor of defendant Engico S.r.l. and against plaintiffs Thompson Corrugated Systems, Inc. and Thompson Corrugated Systems LLC, and that Count III and Count IV are dismissed with prejudice; and

IT IS FURTHER ORDERED AND ADJUDGED that plaintiffs Thompson Corrugated Systems, Inc. and Thompson Corrugated Systems LLC are awarded attorney's fees in the amount of $499,184.50 and are awarded costs in the amount of $19,724.34.

**DATED:  January 17, 2023**

**MONICA A. STUMP, Clerk of Court**

**s/Tina Gray, Deputy Clerk**

**Approved:**   s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

**A49**